**STATE of Missouri, Respondent,**

v.

**Robert W. ALLEN, Appellant.**

**No. WD 37013.**

Missouri Court of Appeals,
Western District.

May 27, 1986.

J.D. Williamson, Jr., Independence, of counsel, for appellant.

William L. Webster, Atty. Gen., Paul La-Rose, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., SHANGLER, J., and NORMILE, Special Judge.

PRITCHARD, Presiding Judge.

By the verdict of a jury appellant was found guilty of capital murder, first degree murder and armed criminal action. For the offenses, he was given these respective sentences: life imprisonment without eligibility for parole for 50 years; life imprisonment; and life imprisonment, the three sentences to run consecutively.

The victims were aged Maurice and Rachel Hudnall, who had been husband and wife for 67 or 68 years, residing in Independence, Missouri.

Eric Wilson was a co-defendant charged with capital murder of both victims and alternatively with first degree murders, burglary in the first degree, robbery in the first degree and armed criminal action. In a plea bargain, Wilson agreed to testify against appellant in exchange for pleading guilty to two counts of first degree murder, for which he received two concurrent

life sentences, and all other charges were dropped.

The brutal facts of these murders were related by Wilson. He lived with appellant and his family, and on January 11, 1984, he and appellant decided to rob the Hudnalls because they were old and it was right after social security checks had arrived in the mail. The following day, the two discussed plans for the robbery which were carried out by the two who walked to the Hudnalls' home with wire snips which were used to cut the telephone wires, and then they knocked on the front door which Mrs. Hudnall answered, and they told her their car had slid off the road. She told them that her husband could not help them, but they pushed their way in the door. With a nightstick in hand, appellant pushed Mrs. Hudnall into a chair while Wilson looked in the bedrooms for money and drugs. When Wilson returned, he saw appellant hit Mrs. Hudnall in the head three times with the nightstick. Appellant told Wilson to knock out the old man with the nightstick, but he hit him with the butt of the knife twice on the head, and Mr. Hudnall fell from a chair near the kitchen. Wilson then found a billfold in the living room and took money from it, telling appellant, "Let's go, we got the money." Appellant told him they had to kill the Hudnalls because they would identify them, and that they had to kill them the way Muslims kill people—by tying "their ankles to their feet" while they were lying on their stomach and then stabbing them in the back of the neck. Appellant stabbed Mrs. Hudnall in the back of the neck. Wilson left the house through the back door and appellant soon followed, going to the house of Neal Allen, where they divided the money, $140.00 each.

The next day, a neighbor placed the Hudnalls' newspaper on their doorstep, and on the following day, January 14, while doing the same, noticed the previous day's newspaper was still on the doorstep, so she called Mr. Hudnall's daughter-in-law, who entered the home through the unlocked door and there saw Mrs. Hudnall lying on the floor. The telephone being dead, she asked a neighbor to call an ambulance, then returned to the Hudnall home. She then saw Mr. Hudnall lying next to his wife, appearing to be rather rigid and was shaking. He told her that they had jerked him out of the chair and hit him over the head. The ambulance arrived and Mr. Hudnall was taken to the Independence Sanitarium, where he died about 8 hours later. A pathologist testified that Mr. Hudnall died of a heart attack as a result of stress related to the circumstances leading up to his death. Her opinion was that the trauma of the blows to his head, lying cold and immobile on the floor for two days, and the loss of his wife, brought on the heart attack that caused his death.

In a pretrial stipulation, the parties agreed that "statements which were made either to family members, police officers or medical personnel by Maurice Hudnall between the time he was found at his home in connection with this incident and the time of his death at the Independence Sanitarium and Hospital, are agreed to be admissible at trial in this case."

On the second day of trial, it appears that the state learned for the first time, through conversation of a state investigator with an ambulance attendant, that Dr. James Riscoe, M.D., had attended Mr. Hudnall in the emergency room of the hospital. The state advised appellant of this the next morning and requested the court to permit late endorsement of Dr. Riscoe as an additional witness. The court permitted the endorsement over appellant's objection, noting that the hospital records indicated that some doctor attended Mr. Hudnall in the emergency room and either the state or the defense could have talked with him and found out what he knew; and the purported statements by Mr. Hudnall to Dr. Riscoe, indicating that there were two persons involved in the attacks, were not inconsistent with other state evidence (that two sets of footprints were found at the scene, and the testimony of the daughter-in-law that Mr. Hudnall said that "they" had jerked him out of a chair and hit him over the head).

Under Point I, appellant makes three basic challenges to the trial court's ruling to

permit the state to call Dr. Riscoe as a witness and to present his testimony: First, that he was not endorsed as a witness under Rule 23.01, and he was not identified to appellant in response to his request for disclosure under Rule 25.05, and the court abused its discretion in ruling favorably to the state's request; secondly, Dr. Riscoe's testimony respecting statements made to him by Mr. Hudnall were hearsay, and the pretrial stipulation (set forth above) did not render it admissible because the stipulation resulted from a mistake of fact on the part of defense counsel not contemplated by his preparation for and conduct of trial; thirdly, appellant says that the disclosure by the state during trial of the witness and his proposed testimony was unfairly prejudicial in that it was a total surprise to him and contrary to other affirmative evidence of the state, and to that revealed to appellant during the course of discovery; and an undue hardship and burden were placed on him by requiring mid-trial preparation and discovery in connection with Dr. Riscoe's proffered testimony.

■ Rule 23.01(f) requires that "The names and addresses of all material witnesses for the prosecution except rebuttal witnesses and witnesses who will appear upon the trial for the production or identification of public records shall be listed. Additional witnesses may be listed at any time after notice to the defendant upon order of the court." The trial court has broad discretion in permitting the late endorsement of witnesses and absent an abuse of discretion or prejudice to the defendant, a conviction should not be overturned because a witness was endorsed on the day of trial. *State v. Morris,* 650 S.W.2d 712, 714[1–3] (Mo.App.1983); *State v. Lorenze,* 592 S.W.2d 523, 527 (Mo.App.1979); *State v. Strawther,* 476 S.W.2d 576, 579 (Mo.1972).

■ In *State v. Stokes,* 638 S.W.2d 715, 719 (Mo. banc 1982), factors are listed which a trial court should consider in exercising its discretion in permitting late witness endorsements: whether defendant waived objection (appellant here did not waive objection and preserved the matter in his motion for new trial); whether the state intended surprise or acted deceptively or in bad faith, with intention to disadvantage appellant (the state first learned of Dr. Riscoe on the first day of trial, and informed appellant of that fact the next day, and the trial court granted a recess for him to depose Dr. Riscoe.) Furthermore, the deceased's daughter-in-law was a witness, available to appellant, from whom he could have learned that Mr. Hudnall said, "they" had jerked him out of the chair; the officer, who saw two sets of footprints at the scene, was available as was his photograph of the prints; and the hospital records showed that some doctor had attended Mr. Hudnall. Thus, the testimony of Dr. Riscoe might readily have been contemplated by appellant. The burden of showing that the trial court abused its discretion in permitting the late endorsement was on appellant, and he has not shown such abuse. *State v. Renner,* 675 S.W.2d 463, 465 (Mo.App.1984).

■ Appellant claims that he would not have agreed to the stipulation (above) had he known of Dr. Riscoe and the contents of his testimony, and that this was a mistake of fact by both parties, which renders Dr. Riscoe's testimony inadmissible hearsay. The stipulation is clear. It should be interpreted in view of the result which the parties were attempting to accomplish. *State v. Jones,* 549 S.W.2d 925, 927 (Mo.App.1977). Although courts will relieve parties from a stipulation under some circumstances, "relief is never granted merely for the reason that the case has gone contrary to the expectations of the stipulator." *State ex rel. Turri v. Keet,* 626 S.W.2d 422, 425 (Mo.App.1981). See also 73 Am.Jur.2d Stipulations, § 14, p. 551. It was appellant's position at trial that he was not present at the scene of the crime, but Eric Wilson was. Wilson's testimony refutes that defense, as does other evidence. Thus, the case has gone contrary to appellant's expectation, and relief will not therefore be granted. The stipulation rendered all the hearsay testimony admissible. Point I, in its entirety, is overruled.

■ Upon direct examination, the prosecutor asked Detective Bill Reynolds if he had frisked either appellant or Wilson at the time he arrested them at Allen's home, and he answered "Yes". The state wanted to introduce evidence that appellant was in possession of weapons at the time arrested, showing the judge a pair of brass knuckles and a knife, on the theory that they showed appellant's propensity for violence. The court declined to admit the evidence. On the hearing on motion for new trial, appellant sought to introduce two juror affidavits which indicated that they saw one of the knives being handled by the judge and prosecutor, and overheard it said that the knife was found on Robert Allen. The affidavits also indicated that the jury discussed the issue. The trial court ruled that the effect of the affidavits was an attempt to impeach the jury's verdict, and did not permit them to be received in evidence. The appellant claims that even though the trial court did not admit the weapons into evidence, the state, in effect, got them into evidence as shown by the juror affidavits, and this was error under *State v. Jones*, 583 S.W.2d 212, 216 (Mo.App.1979), holding that it may not be shown that an accused had a weapon on his person at the time of arrest unless he made some attempt to avoid arrest, or unless the weapon was connected to the crime for which the accused is being arrested. Certainly, the affidavits would tend to impeach the verdict, and it has been consistently held that they may not be used for that purpose. *State v. Scrivner*, 676 S.W.2d 12, 14–15, n. 2 (Mo. App.1984); *State v. Finnell*, 280 S.W.2d 110, 114 (Mo.1955); *State v. Westmoreland*, 126 S.W.2d 202, 204 (Mo.1939). In *State v. Simmons*, 563 S.W.2d 91, 92 (Mo. App.1978), it was said, "[J]urors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of motives which induced or operated to produce the verdict." Appellant further claims that the affidavits were not being used to impeach the verdict, but instead to show that the trial court's ruling excluding the weapons from evidence was ineffective.

The result would be the same—impeachment of the verdict by juror affidavits. The trial court did not err in refusing to consider the affidavits, and Point II, raising the issue, is overruled.

All the members of the jury panel were qualified as to their belief in the death penalty, and those who had scruples against it were excused. Although the state requested the death penalty, the jury could not agree upon punishment, and the trial court did not impose the death penalty. Appellant grounds his Point III on the use of the death qualification process on the constitutional guaranty of the 6th amendment right to have a jury selected from a representative cross-section of the community, and his 5th amendment right to have an impartial jury decide his guilt or innocence. Where the death penalty is not imposed, claimed constitutional infringements by reason thereof do not apply. *State v. Davis*, 653 S.W.2d 167, 174[12–15] (Mo. banc 1983); *State v. Richter*, 647 S.W.2d 513, 517[1] (Mo. banc 1983), and cases cited; *State v. Wallace*, 504 S.W.2d 67, 70[2, 3] (Mo.1973); and *State v. Warters*, 457 S.W.2d 808, 812[6] (Mo.1970).

■ Nevertheless, appellant relies upon *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985), where in a bifurcated trial, the jury did not impose the death penalty. The Eighth Circuit found "substantial evidentiary support" for the District Court's conclusion that the removal for cause of "Witherspoon—excludables" resulted in "conviction prone" juries, and affirmed the grant of habeas corpus relief (to McCree) on the ground that such removal for cause violated McCree's constitutional right to a jury selected from a fair cross-section of the community. The Eighth Circuit did not address McCree's impartiality claim. It should be noted that the Missouri Supreme Court has held that it is not bound by the Grigsby decision, and has adhered to its view that the state may constitutionally exclude jurors who cannot consider death as a possible punishment: *State v. Nave*, 694 S.W.2d 729 (Mo. banc 1985); *State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985);

and *State v. Kenley*, 693 S.W.2d .79 (Mo. banc 1985). Note also *State v. Davis*, supra, and see *State v. Edwards*, 712 S.W.2d 412, (Mo.App.1986, No. 49935, handed down April 15, 1986), rejecting that "death qualification" resulted in a conviction-prone jury. In any event, the Grigsby case was reversed in *Lockhart, Director, Arkansas Department of Corrections v. McCree*, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.3d 137 (1986), holding not only that the fair cross-section of the community standard was not violated by the death qualification procedure, but also that it did not offend McCree's right to an impartial jury, and under the data introduced by him of various studies, it was noted that assuming that the studies are both methodoligically valid and adequate to establish that "death qualification" in fact produces juries somewhat more "conviction prone" than "non-death-qualified" juries, the Constitution does not prohibit the states from "death qualifying" juries in capital cases. Under the Lockhart decision and other Missouri decisions cited, supra, Point III is without merit and is overruled.

■■■ In Point IV, appellant claims error in the trial court's overruling of his objection to this closing argument of the prosecutor: "And if you go in and rob somebody and somebody gets killed, it doesn't matter who's holding that knife, you are both responsible. Eric Wilson came in and 'fessed up to that. He pled guilty to what he's guilty of. He didn't get a cut deal. Under the law if you go and rob people and somebody gets killed, you're guilty of murder in the first degree. He's not guilty of capital murder." Although there is merit in respondent's position that appellant's point is not preserved for appeal, in that he shifted, modified or expanded his trial court objection in his motion for new trial and here, disposition need not be based thereon. Rather, the prosecutor's argument was retaliatory in nature because appellant had raised the issue of Eric Wilson's plea bargain and implied that he had lied so that he could receive lesser sentences. The trial court is possessed of discretion in ruling the scope of final argument, and its rulings will not be disturbed unless there is a clear showing of an abuse of discretion. *State v. Britton*, 647 S.W.2d 155, 157[2, 4] (Mo.App.1982). It is the rule that where a prosecutor's argument might otherwise be improper, it is permissible for him to retaliate in regard to an issue raised by an accused's argument. *State v. Britton*, 647 S.W.2d 155, 157 (Mo.App.1982); *State v. Buford*, 619 S.W.2d 777, 782 (Mo. App.1981). The trial court did not err in overruling appellant's objection to the argument, and Point IV is overruled.

■■■ In Points V and VI, appellant contends that Instruction No. 10 was unsupported by evidence that his striking Mr. Hudnall caused his death which he says resulted from a heart attack, and that there was insufficient evidence, for the same reason, for a conviction for his death under Count II. Dr. Bonita Peterson, M.D., Jackson County Medical Examiner, gave her opinion that "Mr. Hudnall died as a result of stress related to the circumstances of his death with the actual cause of death being a cardiac arhythmia secondary to his arteriosclerotic heart disease." She testified further that the trauma to his head, lying cold and immobile for two days and the loss of his wife were the cause of his death that brought about his heart attack. As pertinent, Dr. Riscoe testified that Mr. Hudnall was at risk of suffering brain injury as a result of the blow to the head, and that he was at risk for a possible heart attack from dehydration, renal shutdown, and underlying cardiac condition. These cases establish the rule that where one inflicts an injury on another, he is guilty of homicide if the injury contributes mediately or immediately to the death of such other, and the fact that other causes contribute to the death does not relieve the actor of responsibility: *State v. Butler*, 534 S.W.2d 832, 835–836 (Mo.App.1976); *State v. Williams*, 588 S.W.2d 70, 74–75 (Mo.App. 1979); *State v. Daugherty*, 631 S.W.2d 637, 640 (Mo.1982); and *State v. Bolder*, 635 S.W.2d 673, 680 (Mo. banc 1982). Points V, VI are overruled.

The judgment is affirmed.

All concur.