**STATE of Missouri, Respondent,**

v.

**Heath A. WILKINS, Appellant.**

No. 68393.

Supreme Court of Missouri,
En Banc.

Sept. 15, 1987.

Rehearing Denied Oct. 13, 1987.

Janet M. Thompson, Nancy A. McKerrow, Columbia, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Chief Justice.

Defendant Heath A. Wilkins pleaded guilty to first degree murder and was sentenced to death for the brutal and multiple stabbing killing of a 26–year-old mother of two small children during the course of a robbery of the victim's convenience store. Affirmed.

Defendant, proceeding pro se after dismissing and waiving appointed counsel, entered pleas of guilty to the murder charge, armed criminal action (sentenced to life imprisonment), and unlawful use of a weapon (sentenced to five years imprisonment), the last charge arising at the time of defendant's arrest approximately two weeks after the murder. Even though defendant dismissed and waived his right to an attorney, the trial judge directed the attorney to stand by throughout all of the proceedings and be available to counsel and advise the defendant upon the latter's request.

The transcript of some 300 pages clearly reveals that the experienced and capable trial judge, the Honorable Glennon E. McFarland, fully explained, time and time again, defendant's various legal rights. Judge McFarland made repeated efforts to dissuade defendant from dismissing counsel and proceeding without an attorney. And, the conscientious trial judge offered to permit defendant to reconsider and withdraw his guilty pleas. Throughout the several court hearings, the defendant told the trial judge that he had fully and knowingly considered the alternative punishment of life imprisonment without eligibility for parole and that of the two possible sentences he preferred the death sentence. Section 565.020, RSMo 1986.

Because of defendant's stated position and acting as his own attorney, defendant did not take any of the prescribed steps to appeal his guilty plea and death penalty. Nevertheless, this Court requested the State Public Defender to enter the case as amicus curiae and to brief and argue "any issue subject to review."

The case was argued before the Court after defendant, appearing in person, advised the Court that he did not want the assistance of an attorney in the proceedings in this Court. At the conclusion of the arguments, the defendant was permitted to make a statement to the Court in which he took issue with some remarks of the public defenders arguing the case. The Court ordered defendant examined by the Department of Mental Health of Missouri to determine defendant's competence to waive counsel on appeal and ordered the case held under submission pending the report.

The report and evaluation of the defendant by the Department of Mental Health was filed with the Court, and the Court set aside the submission and appointed counsel to represent defendant. New briefs were filed and argument heard anew.

The complete record, consisting of the legal file and transcript, are before the Court. In order that this Court can properly review the death penalty imposed in this case and also consider the points advanced by the appointed counsel, it is necessary to set forth in some detail the evidence which led to the imposition of the ultimate penalty.

Approximately two weeks before July 27, 1985, the date of Nancy Allen's murder, defendant's friend, Patrick Stevens, was telling the defendant that he needed some money. "I [Wilkins] said, 'I know where we can get some money.' ... I told him exactly how we were going to do it and where we were going to do it." Defendant then described to Stevens a plan to rob Linda's Liquors, which was later communicated to two other confederates, Ray Thompson and Marjorie Filipiak. Linda's Liquors and Deli was owned and operated by Nancy and David Allen. It is a small convenience store located in the town of Avondale.

The four freely discussed the plan to rob Linda's or an alternative location during the next two weeks. Defendant also stated to the others that he would kill whoever was behind the counter because he wanted no witnesses. During the period before the crime, defendant sharpened his "butterfly" knife (a narrow-bladed martial arts weapon) with a diamond file. Defendant's girl friend, one of the four privy to the plan, attempted to dissuade him from his murderous plot. She had obtained some money from her parents and offered to run off with defendant but he declined.

On the evening of July 27, 1985, the four individuals were together. Defendant and his cohorts decided that the robbery of Linda's Liquors and Deli was on for that night. They all went to North Kansas City Hospital where they arrived about 10:15 p.m.

Leaving the other two, who were to secure taxis for after the robbery, defendant and Stevens left the hospital. To avoid detection they went through the woods to the deli. They carried a bag for carrying stolen merchandise. They arrived at a creek near the deli about 10:30 p.m. They observed the deli for a time because there were customers present. When the last customer had gone, they approached the deli. They took a towel out of the bag and wiped their shoes so that they would not

leave mudprints. So that the counter person, Nancy Allen, would not be suspicious, they left the bag outside.

According to their prearranged plan, defendant ordered a sandwich while Stevens went to the rest room behind the counter. Noticing that Nancy Allen was not where Stevens could easily reach her, defendant asked her for additional lettuce. When she moved to comply with the defendant's request, Stevens rushed out of the rest room and grabbed her. Defendant went around the counter and thrust his knife into her back. Defendant said he was aiming at the kidneys, which he thought would be a fatal wound.

Nancy Allen fell face down onto the floor. However, she rolled into a spread-eagled position with her back on the floor. Stevens could not find everything that he wanted to take and could not operate the cash register. He asked defendant what to do. Nancy Allen replied, directing Stevens to what he sought but this caused defendant to stab his helpless victim three more times in her chest. Two of these pierced the heart. She continued to speak, begging for her life. Defendant silenced her with four stabs into the neck, one of which opened the carotid artery. ·

As Nancy Allen's pierced heart oozed its life's blood into the opened cavities of her lungs and onto the floor, defendant and Stevens gathered up cash and merchandise and left the store. Defendant wiped fingerprints off the door handle before leaving. They stuffed the stolen items in the bag outside and left. Nancy Allen lay dying on the floor.

The pair met their compatriots at the hospital. They paired up and left in separate taxis for the Greyhound Bus Depot. They paired up again in a different combination and went to their common summer hangout, Sherwood Lake. The cash register coin tray was thrown into the lake and they burned the stolen checks. A week

later defendant wanted Stevens to lure "some guys" into the lake area so he, the defendant, could kill them. This action was aborted when a police officer came into the area and defendant threw the murder knife into the lake.

Street talk led the Metropolitan Major Case Squad to the defendant and his companions, and they were picked up by police on August 10th. Before taking a statement, Detective Ron Nichola advised defendant of his rights. Defendant's mother, Lt. Dave Rogers, and a juvenile officer were also present. An extremely incriminating statement was taken. The certification for 16–year–old Heath Wilkins' trial as an adult was obtained on August 15, 1985 as required by Section 211.071, RSMo Supp.1984.

The litany of Fifth Amendment rights was read again to defendant at his arraignment in circuit court on October 17, 1985. Appointed counsel Fred Duchardt of the Clay County Public Defender's Office represented Wilkins and entered a plea of "not guilty by reason of mental disease or defect excluding responsibility" or "not guilty" to all the charges against defendant. A mental examination was ordered and the results from the Western Missouri Mental Health Center were filed with the court on December 19, 1985. Defense counsel sought an additional examination, which was obtained privately at the Menninger Clinic in Topeka, Kansas. The results of that examination became available in April of 1986.

A competency hearing was set for April 16th to inquire into the competency of the defendant at the time of his act as well as his present competency to stand trial. Unknown to the court but after long discussions with attorney Duchardt, defendant reversed his position. Defendant wanted to release counsel and proceed pro se, plead guilty, waive jury trial, and actively seek a sentence of death as his penalty.[1] The trial

---

1. This is not as novel as it might sound. *See* Urofsky, *A Right to Die: Termination of Appeal for Condemned Prisoners,* 75 J. of Crim.L. & Criminology 553, 553 (1984) (examining cases where convicted murderers voluntarily terminat-

ed appeals that would have delayed their executions). "For some on death row, however, the darkest fear is not execution, but the prospect of living out their natural years incarcerated in a six-by-nine cell, under constant surveillance,

court first became fully aware of this turn of events at the April 16th competency hearing. Dr. Steven A. Mandracchia examined the defendant on November 27, 1985 before knowing that defendant intended to seek the death penalty. However, Dr. Mandracchia's opinions about defendant's competency were unequivocal. He said "that there was no evidence of mental disease or defect as defined by chapter 552 of the revised statutes of the state of Missouri." Later, after being advised of the defendant's intention to seek the death penalty, his opinion did not change. "I don't feel that he has any psychological or intellectual or cognitive limitations on his capabilities."

Dr. William S. Logan, M.D., Director of Law and Psychiatry at the Menninger Foundation, examined the defendant in March 1986 after the defendant had made his fateful decision. Attorney Duchardt had fully advised Dr. Logan of Wilkins' intentions as did the examinee himself. Dr. Logan resisted giving the categoric competency opinion that Dr. Mandracchia had given. Nonetheless, he found that the defendant had average intelligence. Moreover, although he found that Wilkins suffered from some emotional disorders of long standing, Dr. Logan "didn't see [Wilkins] as meeting the criteria for a severe mental illness as defined under the statutes of Missouri." In fact, Dr. Logan characterized "the execution of the crime as very purposeful, very deliberate, very well planned ... [with the defendant making] numerous efforts to avoid detection, showing that he appreciated the wrongfulness of it...." After hearing this testimony and interrogating defendant, the court found defendant to be competent.

Despite the finding of defendant's competency, Judge McFarland did not immediately grant his motion to proceed pro se. The right to proceed without counsel upon a voluntary and intelligent election has been recognized by the Supreme Court of the United States. *Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975). However, the *Faretta*

court recognized the disadvantages to a defendant who proceeds *pro se. Id.* at 834–35, 95 S.Ct. at 2540–41. Here, the trial court found itself faced with a peculiar constitutional quandary—a defendant may not be convicted and imprisoned without being accorded the right to assistance of counsel but a defendant may help himself into a conviction by his voluntary albeit inadequate self-representation. *Id.* at 832–33, 95 S.Ct. at 2539–40.

Consequently, the circuit judge took steps to ensure that the gravity and importance of defendant's decision was brought home to him. Judge McFarland explained the advantages of counsel to defendant, highlighted defendant's own inadequacies of education, age, and experience, and set the pro se hearing off for another week to ensure that defendant gave additional thought to this matter.

When the hearing resumed on April 23, 1986, the judge strongly voiced his belief that defendant should be represented by an attorney. He explained each consequence of defendant's action: the waiver of trial by jury on each charge including both phases of the murder trial, the ranges of punishment, the necessity of written waivers, as well as a detailed and vivid description of the effects of execution by poison gas. Finally, he set a pleading hearing for May 9th and admonished the defendant to talk to those whom he trusted and who could advise him about his chosen course.

On May 9th, the circuit court reconvened to consider defendant's desire to change his pleas to guilty and to waive trial. Again, the court persisted in its efforts to convince the defendant that the course was unwise. Again, the court advised him of the enormity and finality of his waivers of legal rights. Defendant politely but firmly rejected the court's advice. Judge McFarland explained that this course would probably lead the court to impose a death penalty. But, he explained that defendant might still get the life sentence. Finally, the court took evidence to substantiate a factual basis for the change of plea. At length, the court concluded that defendant under-

with little or no hope of ever regaining their freedom." Id.

stood the consequences of his actions and that defendant voluntarily and knowingly was waiving his rights and entering guilty pleas, and the court accepted the pleas of guilty to all the charges including murder in the first degree.

At the sentencing hearing of June 27, 1986, the court entered the maximum sentences on the two lesser charges. Judge McFarland again reviewed the variety of rights available to the defendant for the asking. Defendant declined again. The court offered him a chance even at this late stage to withdraw his plea.

> **The Court**: You understand that I think it would be in your best interests that you withdraw your plea?
>
> **Defendant**: "I understand what you think, your Honor."

Evidence was taken in the sentencing stage. It amply supports the guilt of the defendant. Heath A. Wilkins stood up at his last opportunity to address the circuit court and told the court, "... I'm asking the court to consider the death penalty as a [sic] more humane in the extent of possible happenings and pain received by, you know, me.... One I fear, the other one I don't."

Judge McFarland entered his order.

> The court does feel that the defendant's decision [to ask for death] was made rationally and after due thought and deliberation.... The court finds beyond reasonable doubt that the following aggravating circumstances exist: number one, the murder in the first degree was committed while the defendant was engaged in the perpetration of the felony of robbery; and, number two, the murder in the first degree involved depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman.

Section 565.032.2 subs. (11) and (7), RSMo Supp.1984 (respectively).

Counsel for defendant raise four major points and multiple sub-points in their brief. First, that the trial court erred in finding defendant competent to proceed because the evidence was inadequate and that the trial court failed to make specific findings on the defendant's competency to waive his constitutional rights.

Second, counsel argued that the circuit court failed to consider mitigation at the sentencing hearing as required by the decision of the Supreme Court of the United States and the Missouri sentencing statute. Counsel also contend in their second point that the trial court erred quantitatively in weighing the aggravating circumstances it had found against the mitigating circumstances it had found. The court did not find two other aggravating circumstances beyond a reasonable doubt that had been requested for consideration by the State: "The offender committed the offense of murder in the first degree for himself or another, for the purpose of receiving money or any other thing of monetary value from the victim of the murder or another." Section 565.032.2(4). "The murdered individual was a witness or potential witness in any past or pending investigation or past or pending prosecution, and was killed as a result of his status as a witness or potential witness." Section 565.032.2(12).

Third, the death sentence should be set aside because it is comparatively disproportionate to the penalty imposed in similar cases.

Finally, counsel contends that the death penalty is cruel and unusual per the Eighth Amendment of the United States Constitution and Article I, Section 21 of the Missouri Constitution.

■ This Court has repeatedly rejected constitutional challenges to Missouri's death penalty provisions. *State v. Driscoll*, 711 S.W.2d 512, 517 (Mo. banc 1986) (list of citations). Similarly, the Supreme Court of the United States has held that the death penalty is not per se cruel and unusual punishment prohibited by the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. 153, 188–95, 96 S.Ct. 2909, 2932–36, 49 L.Ed.2d 859 (1976) (plurality opinion). Recent decisions have not varied from that course. *See Project: Criminal Procedure*, 75 Geo.L.J. 1170 (1987). The point should be denied.

■ Counsel contends that the lower court's finding of defendant's competency was not supported by sufficient evidence; further that the trial judge failed to make a specific finding of defendant's ability to waive constitutional rights. In testing sufficiency, the reviewing court does not weigh the evidence but accepts as true all evidence and reasonable inferences that tend to support the finding. *State v. Brown*, 660 S.W.2d 694, 698–99 (Mo. banc 1983). This Court has observed the defendant, his demeanor, and listened to him, and the trial judge had over a period of months observed the defendant for prolonged sessions of hearings.

The psychological record is not insufficient as characterized by counsel but extensive and consists not only of the expert testimony but also the galaxy of tests, and records on which they relied, from the numerous institutions with which defendant had dealt. The basic test is whether mental illness renders the criminal defendant incompetent to stand trial because he "lacks capacity to understand the proceedings against him or to assist in his own defense." Section 552.020.3(1), RSMo Supp.1984; *see Winick, Restructuring Competency to Stand Trial*, 32 U.C.L.A. L.Rev. 921, 923 (1985). The overwhelming and uncontroverted evidence on this record establishes that defendant has met and continues to meet this basic test.

■ Counsel urge that there should be a heightened test of competency in this case. Although an incompetent, as a juvenile, may be impaired by his limited cognitive and social capacities, *cf. Winick, supra*, at 961 (discussing various situations in which a defendant may waive his incompetency status), Judge McFarland could not have been more unbiased, reasonable and fair in his consideration of competency. Any finding of competency necessarily entails the ability to waive certain rights beginning with the very first strains of *Miranda*. *Id.* at 961 (juveniles may validly waive both self-incrimination and right to counsel privileges). Moreover, and analogous to the threshold question of competency to stand trial, Missouri law presumes competency, as all persons are presumed to be free of mental disease or defect which would exclude their responsibility for their conduct. Section 552.030.7, RSMo Supp.1984. The point is denied.

■ In the second point it is contended that the trier failed to consider mitigation as required by state statute, Section 565.-030.4, RSMo Supp.1984, and by *Eddings v. Oklahoma*, 455 U.S. 104, 110–14, 102 S.Ct. 869, 874–77, 71 L.Ed.2d 1 (1982). This claim is not supported by the record. The trial judge clearly indicates that he considered mitigating factors in addition to defendant's age in the required trial report. Defendant was 16 years and seven months old when he murdered Nancy Allen. He was 17 years and four months old when he pleaded guilty. He had completed nine years of education and had an intelligence quotient of 105.[2]

The report of the trial judge shows that he considered whether the murder "was committed while the defendant was under the influence of extreme mental or emotional disturbance." Section 565.032.3(2), RSMo Supp.1984. Second, he considered whether "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Section 565.032.3(6).

Counsel suggest that the weighing of mitigating factors is a quantitative or tallying process. Clearly it is not. For example, the trier must assess the punishment in a capital murder case at life imprisonment "[i]f the trier finds the existence of one or

---

**2.** *See: Burger v. Kemp*, ___ U.S. ___, ___, 107 S.Ct. 3114, 3118, 97 L.Ed.2d 638 (1987) and dissenting opinion of Powell, J., at 3138. Issue was alleged ineffective assistance of counsel. Defendant was 17–years–old at time of murder, had an I.Q. of 82, functioned at a 12–year–old level, and had possible brain damage from beatings when he was a child.

*Thompson v. State*, 724 P.2d 780 (Okla.Crim. App.1986) (defendant 15–years–old at time of murders), *cert. granted*, ___ U.S. ___, 107 S.Ct. 1284–85, 94 L.Ed.2d 143 (1987), to consider whether Eighth Amendment imposes an age limitation on the application of the death penalty.

more mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found by the trier." Section 565.030.4(3), RSMo Supp.1984. Just one mitigating factor might permissibly outweigh several aggravating circumstances under this provision and require the imposition of only life imprisonment and not the death penalty. But the reverse is also true. The trier may find that a single aggravating circumstance beyond a reasonable doubt "warrant[s] imposing the death sentence." Section 565.030.4(2). The trier's judgment as to the appropriateness of the sentence must be guided but is still discretional. The weighing process is a qualitative one not a quantitative one. The trial court considered all the mitigating circumstances fairly presented by the evidence and did not find that they outweighed the aggravating circumstances found beyond a reasonable doubt. The point is denied.

Counsel in point three ask us to do no more than what this Court is mandated to do. Section 565.035, RSMo Supp. 1984. The court must review whether the imposition of the death penalty was influenced by passion or prejudice, was supported by evidence of the statutory aggravating factors enumerated by the trier of fact, or was disproportionate or excessive when compared to similar cases. *See State v. Battle*, 661 S.W.2d 487, 493–95 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984).

▪ The record bears no suggestion of prejudice, passion or any other arbitrary factor. The trial court's patience and fairplay were well-demonstrated throughout. Similarly, the evidence supports his finding that defendant Wilkins committed the murder of Nancy Allen in a wantonly vile, horrible and inhuman manner. With cool, deliberate premeditation he remorselessly executed the prone, helpless Nancy Allen, who had ample time to consider her demise, her husband, and her one-year-old and three-year-old girls. Defendant brutally silenced her pleas for mercy. The defendant freely admits that he committed this murder during a robbery, which supports the

other aggravating circumstance found by the trier. The death penalty was not influenced by passion or prejudice and the evidence supports the trial court's finding of two aggravating circumstances beyond a reasonable doubt.

▪ Finally, we are required to consider whether this sentence of death is disproportionate to the penalty imposed in similar cases considering both the circumstances of the crime and the defendant. *State v. Foster*, 700 S.W.2d 440, 445 (Mo. banc 1985), *cert. denied*, — U.S. ——, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). The cases the Court has reviewed demonstrate the penalty of death imposed here is not excessive or disproportionate to similar cases.

In *State v. Foster*, 700 S.W.2d 440, 441 (Mo. banc 1985), defendant, with an accomplice, planned an armed robbery of the apartment of two acquaintances. The jury in *Foster* found four aggravating circumstances, including two which are essentially identical to those found in the instant case—a murder involving depravity and a murder for gain. Death was imposed. *Id.* at 445.

In *State v. Lashley*, 667 S.W.2d 712, 716 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984), defendant was 17 years and one month old at the commission of the murder. Defendant with the intention of robbing the victim had stabbed the victim who did not die at the instant of attack. Lashley had been committed to various institutions and was considered to be of average intelligence. The death penalty was imposed.

In *State v. Newlon*, 627 S.W.2d 606, 609–10 (Mo. banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982), an armed defendant entered a store with his accomplice after waiting for customers to leave so that the lone attendant would be isolated. Defendant entered knowing that the attendant might be killed after an accomplice's remark before they entered the store. The trier found that the murder was wantonly vile. *Id.* 627 S.W.2d at 621. The death penalty was imposed.

*See also State v. Johns*, 679 S.W.2d 253 (Mo. banc 1984), *cert. denied*, 470 U.S.

1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *State v. Byrd*, 676 S.W.2d 494 (Mo. banc 1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1233, 84 L.Ed.2d 370 (1985); and *State v. Malone*, 694 S.W.2d 723 (Mo. banc 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986).

Aside from the general principles of deterrence, defendant's execution-murder of Nancy Allen is exceptional in its brutality. Unlike any of the cited cases except *Newlon*, the evidence herein demonstrates an *express preexisting plan* on defendant's part to kill anyone and everyone he found at Linda's Liquors and Deli to eliminate potential witnesses. This was no spur of the moment decision on defendant's part, but planned. Although the victim in this case was immediately assaulted when the robbery began, she had a substantial time in which to anticipate her fate and to plead for her life. *Cf. State v. Newlon*, 627 S.W.2d at 622. The suffering of the victim is certainly a factor in comparing this with other cases. *State v. Smith*, 649 S.W.2d 417, 434–35 (Mo. banc), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Even after inflicting a mortal wound upon Nancy Allen, defendant was not content to let her die. He inflicted further mutilation upon her by stabbing her repeatedly in the throat to stop her from talking. *Cf. State v. Johns*, 679 S.W.2d at 257; and *State v. Malone*, 694 S.W.2d at 724. As all of these facts demonstrate, the murder at bar is substantially more heinous than past killings which have been found to justify a sentence of death.

Another factor supporting defendant's sentence, newly recognized in Missouri's 1984 revision of the homicide statutes, is the strength of the evidence against him. Section 565.035.3(3). Heinous murders have been committed in the past in which the evidence of the crime was circumstantial and the precise role of the accused in the killing was unclear; in such cases, an inference exists that the jury may have rejected a sentence of death for that reason. *See, e.g., State v. Turner*, 623 S.W.2d 4, 6–7 (Mo. banc 1981), *cert. denied*, 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); and *State v. Mitchell*, 611 S.W.2d 223, 224–25 (Mo. banc 1981). Such is not the case here. Defendant has admitted and described in great detail his dominant role in the killing of Nancy Allen from his planning of the murder in advance to his stabbing the victim to death, and his account is corroborated by autopsy evidence and the crime scene. By definition, the evidence of defendant's guilt could not be any greater than it is in a plea of guilty.

The final and a most chilling factor to be considered is the nature of defendant himself and his attitude toward human life. In his words, Nancy Allen was a "trash can" whose most convenient disposition was to be killed so she would not be "a bother" to defendant in the future. As evidenced by his actions, this statement by defendant is not mere bravado because he had made a prior and unconditional decision to kill the witnesses to his planned robberies and he had no reason to kill Nancy Allen other than the possibility that she might later testify against him. This was only one of a series of robberies and murders that defendant had intended to commit had he not been apprehended, and he had made attempts to kill people, including his mother, both before and after the Nancy Allen murder. There can be no doubt that, given defendant's attitude, he will unhesitatingly kill anyone who "gets in his way" unless and until he is prevented from doing so by the forces of civilized society. The sentence of death imposed upon defendant is the only reliable means of achieving that aim.

The judgment is affirmed.

ROBERTSON, RENDLEN and HIGGINS, JJ., concur; BLACKMAR, J., dissents in separate opinion filed; DONNELLY, J., dissents in separate opinion filed; WELLIVER, J., dissents in separate opinion filed and concurs in dissenting opinions of BLACKMAR and DONNELLY, JJ.

BLACKMAR, Judge, dissenting.

For the reasons assigned by Judge Billings the points raised by appointed counsel are without substance. The trial judge is

to be commended for his fair and balanced handling of a very difficult situation.

Judge Billings expounds the deliberateness and atrocity of the killing. Judge Donnelly, in his dissenting opinion, demonstrates the vagaries in jury sentencing, describing killings which are no less repulsive, but in which the jury did not assess the death penalty. He senses a tendency to assess life rather than death when the offender is very young. I cannot add to the meticulous scholarship of both of my brethren.

Section 565.035.2, RSMo 1986, effective 10–1–84, directs us to "consider the punishment...." Pursuant to this obligation, I would hold that a defendant who was a juvenile at the time of the offense should not be subject to the death penalty. In *State v. Battle,* 661 S.W.2d 487, 495 (Mo. banc 1983) and *State v. Lashley,* 667 S.W.2d 712, 717 (Mo. banc 1984), I argued unsuccessfully against death sentences for minors. I would draw a line at the juvenile level. Lines must be drawn somewhere; the offender below fourteen may not be punished as a criminal. *See* Section 211.-071, RSMo 1986. The death sentence should be reserved for those capable of *mature* deliberation. *See* Ellison, "State Execution of Juveniles: Defining 'Youth' as a Mitigating Factor for Imposing a Sentence of Less than Death." 11 Law and Psychology Review 1 (Spring, 1987).

It is suggested that my position is contrary to state policy as defined by the legislature, inasmuch as the statutes contain no prohibition on the execution of persons who were juveniles at the time of commission of the offense. I believe that the duties imposed on us by Section 565.035.2 authorize us to adopt some objective standards for imposition of the death penalty. I also submit that our duties under that section are in addition to the duty of comparison imposed by 565.035.3, and that we should undertake a broader review of death sentences than we have in the past.

I concur with Judge Donnelly as to the remaining issues discussed in his dissenting opinion.

DONNELLY, Judge, dissenting.

Mandatory review under section 565.035, RSMo 1986.[1]

In this case, defendant entered pleas of guilty and expressed a desire to be put to death. The Court conducts its mandatory review, § 565.035, RSMo 1986, of a sentence of death, imposed following a hearing to determine punishment, § 565.032.2, RSMo Cum.Supp.1983. For reasons stated, we reduce sentence to life imprisonment without possibility of probation or parole, barring executive act.

The facts are undisputed, drawn from defendant's statements to a police investigator and to the trial court during the sentencing phase, from reports and testimony of psychiatrists who examined defendant, and from the report of a presentence investigator. On the night of the fatal stabbing of Nancy Allen, defendant Wilkins was aged sixteen years, six months, twenty days. For about a month previous, he had been living on the streets of Kansas City with three other juveniles, Pat "Bo" Stevens, Roy "Shades" Thompson, and Marjorie "Midget" Filipiak. At Wilkins' initial suggestion, the foursome plotted to rob area businesses. Defendant proposed, and the group acceded to, Linda's Liquor & Deli in Avondale as an initial target. Wilkins maintained he would kill anyone present to conceal the perpetrators' identities. To facilitate his claimed objective, Wilkins purchased a narrow-bladed, martial arts knife from Stevens with money defendant had stolen from a laundromat.

As preconceived one to two weeks before, an intricate plan unfolded July 27, 1985. At or near 10:15 p.m., the four juveniles met at North Kansas City Hospital. Defendant and Stevens walked through a

---

1. Defendant filed no after-trial motions or notice of appeal in this case. Counsel appointed to represent defendant in proceedings before this Court have briefed and argued numerous points of law. We decline to review these at this time, given our disposition of the case. We intend no suggestion as to the merit of counsel's claims which may be grounds for post-conviction relief under Rule 27.26; defendant may pursue such relief at his option.

wooded area to the nearby deli, leaving Filipiak and Thompson at the hospital to await their return. The two boys stalked the target from along a neighboring creek while customers transacted business in the store and left. It was nearing closing time. Around 11:00 or 11:30 p.m., toting a change of clothes apiece in defendant's handbag, the two youths executed the crime. The handbag was left outside the deli to avert suspicion; both boys wiped mud from their shoes to avoid leaving footprints inside. Nancy Allen, the store clerk, was alone, seated behind the counter, when the boys entered. Wilkins ordered a sandwich. Stevens asked to use the restroom. When Stevens exited, he grabbed the victim, holding her while Wilkins rushed forward, produced the knife, and stabbed her in an area of her back he thought to be her kidney. Allen fell to the floor. Lying on her back, the victim responded to a question Stevens put to her, and began pleading with defendant not to kill her. Wilkins told Allen to be quiet, then stabbed her repeatedly in the chest and throat areas. Expert medical testimony indicated Mrs. Allen probably was deceased before Wilkins imparted the last wound to her body.

Stevens pilfered cash, checks, liquor, cigarettes and rolling papers from the cash register and store displays. Roughly $450.00 in cash and checks were taken. Stevens then "freaked out," and defendant had to push him out the door. Wilkins wiped Stevens' fingerprints from the doorknob before the pair made their immediate flight.

Defendant and Stevens rendezvoused with Filipiak and Thompson at the hospital. To evade any pursuit, the foursome left the hospital in cabs Filipiak summoned from two local cab companies. The juveniles rode in pairs to a Kansas City bus depot. There, they talked a while, divided the stolen cash, and the principals changed clothes. Stevens and Thompson left, again in a cab. Wilkins and Filipiak lagged behind about an hour to play video games, then left by the same means. The four met back at the lake area they frequented in Penguin Park and "tripped out." They used the stolen checks to start a fire. Defendant used his share of the money to buy drugs.

About a week later, Wilkins encouraged Stevens to lure "some guys" into the lake area so defendant could kill them. This plan was aborted when a patrolling police officer happened into the area. Wilkins threw his knife into the lake to avoid discovery. The weapon never was found.

Defendant was arrested August 10, 1985. He acquiesced to giving a statement, in which he admitted to and described in detail the deli store murder.

As indicated above, this case comes to the Court in a peculiar posture. Wilkins was certified to be tried as an adult and was appointed counsel, Mr. Frederick Duchardt. In late January or early February 1986, Wilkins informed Duchardt that he wished to withdraw an earlier plea, not guilty and not guilty by reason of mental disease or defect, and substitute pleas of guilt to all charges.[2] Defendant also expressed a desire to seek the death penalty as his punishment. Counsel refused to aid Wilkins in this sordid goal.

Two psychiatrists and a clinical psychologist investigated defendant's competence to stand trial through interviews and testing. On considering the psychiatrists' testimony at an April 16, 1986, hearing, the trial court found Wilkins competent to proceed. Wilkins immediately moved, *pro se*, to represent himself before the court. One week later, the court accepted defendant's written waiver of counsel.[3] Mr. Duchardt was discharged from representation, but the court ordered him to remain available to answer any legal questions defendant might have.[4]

2. Wilkins was charged with first degree murder, § 565.020.2, RSMo 1986; armed criminal action, § 571.015, RSMo 1986; and unlawful use of a weapon, § 571.030.1, RSMo 1986.

3. The court constantly reminded defendant of the wisdom of professional representation throughout these proceedings.

4. The Court commends Mr. Duchardt's service to the court below, under what undoubtedly were frustrating circumstances.

Wilkins immediately announced his desire to enter guilty pleas to all charges. The court attempted to dissuade him, to the point of describing how lethal-gas executions were performed. Defendant was encouraged to "talk to other people about this decision you're having to make," and the cause was continued until May 9, 1986. Wilkins persisted. When the case was resumed, he offered written petitions to enter the desired pleas. After extensive questioning, during which the trial judge offered defendant every opportunity to change his mind, the pleas were accepted as to each count. Sentencing was scheduled for June 27.[5]

Wilkins was given maximum sentences for the lesser offenses: five years' imprisonment for unlawful use of a weapon, life imprisonment for armed criminal action. The court then considered evidence on the appropriate sentence for Nancy Allen's murder.[6] In a bizarre climax to the proceedings, both prosecutor and defendant urged the ultimate sanction. Defendant realized his goal—the court passed a sentence of death. Supporting the sentence imposed, it found as aggravating circumstances that: 1) Defendant was engaged in perpetrating a felony (robbery) when the murder was committed, § 565.032.2(11); 2) The murder was outrageously or wantonly vile, horrible or inhuman, since it reflected depravity of mind, § 565.032.2(7).

Neither the record nor counsel suggest the sentence imposed reflects the least hint of passion, prejudice or arbitrariness. § 565.035.3(1), RSMo 1986. Moreover, the record supports the court's conclusions under section 565.032.2(7) & (11), RSMo 1986. We turn, therefore, to the dispositive question, "whether the sentence of death was excessive or disproportionate to the penalty imposed in similar cases, considering both

the crime, the strength of the evidence and the defendant." § 565.035.3(3), RSMo 1986. *Under the facts of this case*, in light of Wilkins' age as of the offense, his prolific abuse of drugs and alcohol, *and* his long history of mental and emotional affliction, we hold the sentence excessive and disproportionate, and reduce that sentence to one of life imprisonment without possibility of probation or parole, barring executive clemency. § 565.035.5(2), RSMo 1986.

Relevant cases for a review of the appropriateness of the sentence are those in which the judge or jury first found the defendant guilty of capital murder and thereafter chose between death or life imprisonment without the possibility of parole for at least fifty years. *State v. Bolder*, 635 S.W.2d 673, 685 (Mo. banc 1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1984).

First, we consider defendant's age. In four capital cases involving youths of comparable age, a life sentence was imposed. *State v. Greathouse*, 627 S.W.2d 592 (Mo. 1982) (defendant age seventeen); *State v. Allen*, 710 S.W.2d 912 (Mo.App.1986) (defendant age sixteen); *State v. White*, 694 S.W.2d 802 (Mo.App.1985) (defendant age seventeen); *State v. Scott*, 651 S.W.2d 199 (Mo.App.1983) (defendant age sixteen). Only one Missouri youth has been sentenced to die who was seventeen years old or younger as of his crime. *State v. Lashley*, 667 S.W.2d 712 (Mo. banc), *cert. denied*, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).

In *Greathouse, Allen, White,* and *Scott*, the jury was instructed on defendants' lack of prior criminal activity as a mitigating factor reference sentence. In this sense, the case *sub judice* is distinct.[7] But the jury was similarly instructed in *State v.*

---

5. Indicative of the leeway the trial judge afforded Wilkins, the court informed that in the interim it would consider any change of heart Wilkins entertained reference his plea to the murder charge. Defendant remained firm in his intention.

6. Defendant waived trial by jury for the penalty phase of his murder trial. *See* § 565.030.4, RSMo 1986.

7. Wilkins, from an early age, engaged in arsons, burglaries, and stealing. These activities were before the court for its consideration during sentencing, embodied in Wilkins' juvenile records. § 211.321.1, RSMo 1986.

*Battle,* 661 S.W.2d 487 (Mo. banc 1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984) (defendant aged eighteen years, four months; no significant history of criminal activity; death sentence affirmed), and *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030, *reh'g denied,* 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) (defendant eighteen; same history and sentence). As to *this age group* of offenders, then, the absence, and thus presence, of a significant history of criminal acts may be an unreliable predicate for proportionality review. As to *this age group* of offenders, perhaps the most to be said is that age as a mitigating factor, § 565.030.3(7), RSMo 1986, *standing alone,* is insufficient to overturn a death sentence, on grounds the penalty is excessive or disproportionate, once the trier of fact has passed such sentence. *State v. Lashley,* 667 S.W.2d 712 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984); *State v. Battle,* 661 S.W.2d at 494–95.[8]

Next, we look to cases in which death was imposed on a young offender and make comparison based on the nature of the killing. In *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983), *cert. denied,* 463 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984), defendant, eighteen, stabbed an eighty-year old woman with a twelve-inch butcher knife. The mortal wound was inflicted just below the victim's left eye. The elderly woman, "naked, beaten and ravished," suffered nearly three hours before she died. The jury recommended the death penalty, after being instructed only on the "vile, horrible or inhuman" nature of the killing as an aggravating circumstance. *See* § 565.032.2(7), RSMo 1986. *Battle* is different from this case. Nancy Allen was not sexually abused before or after the murder, *compare State v. White,* 694 S.W.2d 802 (Mo.App.1985) (indications victim may have been sexually molested after death; defendant, seventeen, received life

sentence), *with sub judice and Battle;* and, no evidence indicated Mrs. Allen suffered for any prolonged period after Wilkins attacked her. Indeed, the coroner indicated she may have been dead by the time defendant imparted the last wound. Certainly this killing, however senseless, was no more repulsive than those involved in *State v. Beck,* 687 S.W.2d 155 (Mo. banc 1985), *cert. denied,* — U.S. —, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986) (nineteen-year old shot and killed elderly couple; life sentence); *State v. Greathouse,* 627 S.W.2d 592 (Mo.1982) (seventeen-year old struck uncle with ax, then shot him eight times; life sentence); *State v. Baskerville,* 616 S.W.2d 839 (Mo.1982) (nineteen-year old; triple-murder, life sentence); *State v. Allen,* 710 S.W.2d 912 (Mo.App.1986) (sixteen-year old, given life imprisonment; insisted after robbing couple, aged 67 and 68, that they be killed "the way Muslims kill people—by tying 'their ankles [?] to their feet' ", laying each on stomach, then stabbing each in back of neck); *State v. Hurt,* 668 S.W.2d 206 (Mo.App.1984) (nineteen-year old, penitentiary inmate, killed cellmate by stabbing him more than sixty times; life term imposed); *State v. Scott,* 651 S.W.2d 199 (Mo.App.1983) (sixteen-year old; life imprisonment; robbed elderly couple at gunpoint, then stabbed wife twenty-two times; husband, also stabbed multiple times, survived).

In *State v. Lashley,* 678 S.W.2d 712 (Mo. banc), *cert. denied,* 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984), the victim was stabbed in an area of her head where a section of skull had been surgically removed, exposing a "soft spot." Defendant was "seventeen years and one month old" as of the killing. His motive was to rob his fifty-five-year old, handicapped cousin; he did so in a manner described as "classic lying in wait." *Id.* 678 S.W.2d at 716. Wilkins' crime fits this genre. *See* § 565.032.2(4), RSMo 1986. But more is involved

---

**8.** Counsel invite the Court to consider whether sentencing a minor to die constitutes a *per se* violation of the Eighth Amendment of the Federal Constitution. We decline. *Battle* and *Lash-ley* state the law in Missouri barring contrary adjudication in the United States Supreme Court. *See Thompson v. Oklahoma,* — U.S. —, 107 S.Ct. 1284, 94 L.Ed.2d 143 *cert. granted,* — U.S. —, 107 S.Ct. 1284–85, 94 L.Ed.2d 143 (1987).

here, making *Lashley* distinct.[9] In none of the above, *Lashley, Battle, Blair, Beck, Greathouse, Baskerville, Allen, Scott, Hurt,* or *White,* was the nature of the defendant such as to raise serious question, as here, whether the defendant should be held so completely responsible for his conduct that we should affirm his sentence.[10]

At age ten, Wilkins was referred to Tri-County Mental Health Center. For the next four to five years, excepting a seven-month probationary period at home, defendant underwent evaluation, treatment and detention at various Missouri institutions. He was diagnosed as possessing a borderline personality, schizotypal personality, and perhaps developing schizophrenia.[11] He was withdrawn, isolated, depressed, impulsive, displaying intermittent episodes of paranoid functioning. On at least two occasions, he was prescribed antipsychotic medication. Officials at Crittenton Center expressed concern that defendant was at risk for violent, destructive, or self-destructive acts.[12] Indeed, Wilkins had on a number of occasions attempted suicide by cutting his wrist, overdosing on medication or illegal drugs, and leaping from a bridge into the path of a passing car.

Dr. Logan, who examined defendant to determine his competence to proceed below, intimated that Wilkins' heavy drug use was tied to his cognitive functioning.[13] Dr.

Parwatikar, who interviewed Wilkins at this Court's instance to determine his competency to waive appellate counsel, suggested defendant's youth, in turn, was a feature which distinguished his mental and emotional make-up from a mere antisocial condition.

Dr. Logan testified below that Wilkins "suffered from an ongoing emotional disturbance" of "profound" proportion; he reported that defendant's actions on July 27, 1985, could not be divorced from his psychopathology. Even though Wilkins' condition could not be termed a legally recognized mental disease or defect, Chapter 552, RSMo 1986, Logan submitted in his report that:

> This is not to say that defendant did not suffer from significant impairment in his mental functioning as a result of mental disease which at the time of the crime hindered his emotional realization of the nature, quality, and wrongfulness of his conduct, and hindered his cognitive control of his conduct ..."

*On these facts,* considering defendant's age, *and* his significant cognitive-emotional disorder, *and* connected, extensive drug abuse, we hold the sentence excessive and disproportionate. Consistent with this holding, we reduce Wilkins' sentence to life imprisonment without possibility of probation or parole barring executive act.[14]

9. We also note "the issue ... is not whether any similar case can be found in which the jury imposed a [death] sentence, but whether the death sentence is excessive or disproportionate in light of 'similar cases' as a whole." *State v. Mallett,* 732 S.W.2d 527, 542 (Mo. banc 1987).

10. We do not ignore the carefully-planned and carefully-executed nature of this heinous offense. Nor do we take lightly defendant's apparent disregard for the lives of others. We find only that Wilkins' age, his mental and emotional instability, *and* extensive drug use coagulate, inseparably, to quicken the conclusion, in our view the only conclusion, that the ultimate price is an excessive one to be levied on this defendant.

11. Wilkins' brother was diagnosed a schizophrenic in 1982. His father was committed for a period of time in an Arkansas mental facility. On these bases, one examining psychiatrist suggested defendant's dysfunctioning may have a genetic component.

12. Examining psychiatrist William Logan indicated these actions were intimately bound with defendant's disorder.

13. Defendant had used marijuana since he was five. He had abused inhalants, stimulants and depressants since age six. In the three summers prior to 1981, he estimated he had inhaled gasoline fumes on about 500 occasions. Since at least age ten or eleven, Wilkins had used LSD, by admission his favorite drug. On July 27, 1985, defendant ingested a home-made strain of the drug three times, the last at around 7:30 p.m. We find this drug use significant only to the extent it was a product of Wilkins' disorder, and to the extent it lends greater force to our conclusion, considered *in tandem* with the other factors we find persuasive in reducing sentence.

14. Defendant's desire to obtain the death penalty is noteworthy only in that we find it impertinent to this or any review under section 565.035. This Court will not permit a defendant to employ the judicial process as a vehicle for state-aided suicide.

After argument and submission, this cause was assigned to me for opinion. That opinion, which is set forth above, was rejected by the majority of the Court.

I respectfully dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent. The principal opinion treats this case as though it were here on appeal, which it is not, and in my opinion, glosses over our statutory duty to make examination as to proportionality of the sentence. § 565.035.3(3), RSMo 1986. I concur in the separate dissenting opinion of Blackmar, J. and the separate dissenting opinion of Donnelly, J.

The record before us is a documentary of defendant-"appellant's" exposure to and his failure to respond to almost every known social program of this society during the first almost seventeen years of his life. Regardless of the current belief of many that the death penalty is a deterrent to crime, utilization of the death penalty in cases such as this only serves to bury and cover up the failures of our existing social and penal programs. The death penalty was never intended to punish crimes committed by juveniles and is totally disproportionate to the punishment of similar crimes committed by those of similar age. See cases cited in separate opinions of Donnelly, J. and Blackmar, J. The punishment should be reduced to life imprisonment.