STATE of Missouri, Respondent,

v.

Shawn R. BONUCHI, Appellant.

No. 62683.

Supreme Court of Missouri,
En Banc.

Aug. 2, 1982.

As Modified on Denial of Rehearing
Aug. 23, 1982.

David M. Strauss, Public Defender, Columbia, for appellant.

John Ashcroft, Atty. Gen., Steven H. Akre, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM:

Appellant, Shawn R. Bonuchi, was convicted of first-degree murder by a jury in the Circuit Court of Johnson County, Missouri, and his punishment was assessed at imprisonment for life. Following rendition of judgment and imposition of sentence, an appeal was perfected to this Court. Mo. Const.Art. V, § 3.

Stephen Walker testified that at 2:00 a.m. on November 29, 1978, he gave a ride to appellant, who was hitchhiking at the time in Columbia, Missouri. He testified that they drove around awhile, smoked some marijuana, and got into a lengthy discussion about restrictions at the Mexican border. He testified that appellant asked him if a young man driving a new Trans Am or a new Pontiac Firebird Formula would be checked strictly at the border. Appellant then asked Walker to drive to Kelley Pontiac to look at cars. On the way, appellant told Walker that he was planning to steal a car. He asked Walker if he would go with him to test drive a car since he was not old enough to test drive the car himself and did not want a dealer along with him. Appellant told Walker that he already had license plates to put on the car after it was stolen. When they arrived at Kelley Pontiac, they looked at a Firebird Formula and a Trans Am Firebird. Appellant indicated to Walker that he was going to steal a car the following day. After leaving Kelley Pontiac, Walker dropped appellant off in the area where he had picked him up earlier that morning.

Two Kelley Pontiac employees, John Ireland and Kenneth Hendren, testified that at 11:00 a.m. on November 29, 1978, they observed Gregory W. Bond, a salesman, drive from the Kelley car dealership with two white male youths in a new 1979 blue Pontiac Firebird Formula. Ireland testified

that he saw Bond take his dealer license plate with him when he and the two youths walked to the automobile in the lot.

Officer Michael Selfridge of the El Reno, Oklahoma, Police Department testified that on November 30, 1978, he saw a blue 1979 Pontiac Firebird in the El Reno cemetery. As the officer drove toward the Pontiac in his police car, appellant and Mitchell Dean Osburn exited the car and began to walk away. Selfridge ordered them to stop and return to the car. Selfridge had noticed that the Pontiac had no Missouri license plate on the front of the car and that the Missouri license plate on the rear of the car had been attached with a piece of wire. Officer Dennis Samples, another El Reno, Oklahoma, policeman, arrived at the cemetery to assist Officer Selfridge. The two officers inventoried the Firebird and found in the trunk a 20-gauge double barrel shotgun. A vehicle identification number check revealed that the Firebird had been stolen the previous day from Kelley Pontiac in Columbia, Missouri. The officers placed appellant and Osburn under arrest and took them to the El Reno City Jail.

Boone County Sheriff Charley Foster found Bond's body some twenty feet from a road in the northern part of Boone County, Missouri, at about 7:00 p. m. on November 30, 1978. Dr. Lowry Kirk Arnold, a pathologist and Boone County Deputy Medical Examiner, performed an autopsy on the victim's body on December 1, 1978. Dr. Arnold testified that Bond died from two shotgun wounds, one of which lacerated the right lung and the liver and the other of which shattered the breast bone and three ribs and separated the aorta and pulmonary arteries from the heart. Fragments of plastic shotgun shells, wadding, and shotgun pellets were found in the wounds.

Type "A" human blood was found on the spoiler on the back of the Pontiac and on the dealer's license plate, which the El Reno police had discovered under the driver's seat in a second inventory of the car.

■ Appellant first asserts that there was insufficient evidence presented to sustain the conviction. The assertion is without merit. "A review of the record in the light most favorable to the prosecution convinces us that a rational fact finder could readily have found [appellant] guilty beyond a reasonable doubt of first-degree murder under [Missouri] law." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560 (1979).

■ Appellant next asserts the trial court erred in admitting into evidence the shotgun found in the trunk of the stolen car. The assertion is without merit. Demonstrative evidence is admissible "if it throws any relevant light upon a material matter at issue," *State v. Murphy*, 592 S.W.2d 727, 730 (Mo. banc 1979), or if it "tends to establish any fact in issue or * * aid the jury in any way in arriving at a correct verdict," *State v. Holmes*, 609 S.W.2d 132, 136 (Mo. banc 1980). "Articles, instruments and weapons that have a tendency to explain the manner in which a crime was committed that are found at or near the scene of the crime subsequent to the commission of a crime are generally admissible." *State v. Neal*, 591 S.W.2d 178, 180 (Mo.App.1979). The trial court has discretion whether to admit or exclude demonstrative evidence. *State v. Murphy*, 592 S.W.2d at 730.

■ Appellant finally asserts that the trial court committed error in failing to suppress certain credit cards, a driver's license, and testimony regarding the victim's body, because all were found as a direct result of illicit interrogations of appellant and, therefore, were "fruits of the poisonous tree." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

At a pretrial hearing on motions to suppress evidence, Officer Dennis Samples, one of the arresting officers, testified that when he and his colleague arrested appellant and Osburn, they searched the Pontiac Firebird and the grounds immediately around it. They found a shotgun in the trunk of the car, but found no evidence on the grounds near the car.

Before noon on November 30, 1978, the day appellant was arrested, a licensed attorney practicing in El Reno, Oklahoma, was appointed by the court to represent appellant and Osburn. He talked to appellant and Osburn that day and advised Captain Ray Watson of the El Reno Police Department and Stan Chatman of the District Attorney's office that no statements were to be taken from either of his clients. Despite this explicit directive, the El Reno police interrogated appellant on several occasions that afternoon without reading him his rights as required by *Miranda, supra.* Among other things, the police asked him if any evidence remained at the location of his arrest. He told them that some shotgun shells were there and that Bond's credit cards and driver's license were hidden near where he had been arrested.

Acting on this information, the El Reno police searched the area that afternoon, looking for these items. They found nothing. Early the following morning, on December 1, Captain Watson and two other officers asked appellant if he would go with them to the cemetery and show them where the evidence was hidden. This request was made of appellant several times before he replied that he would go out there and show them where the things were if it was okay with his attorney. Captain Watson told him he would contact his lawyer for him. Watson left appellant's presence, returned about five minutes later, and stated that appellant's attorney said that it was all right for him to accompany them. Watson had not contacted appellant's lawyer and had not received the lawyer's permission for appellant to accompany him to the arrest site. Appellant accompanied Watson to the arrest scene and pointed out exactly where Osburn had buried Bond's driver's license and credit cards and where some shotgun shells lay. None of the officers seized the evidence at that time. They took appellant back to jail. During a police search of the arrest site that afternoon, some shotgun shells were found, but Bond's credit cards and driver's license were not found.

The following day, December 2, 1979, a group of civil defense volunteers was organized to search the arrest site. They were told to search for any documents or papers relating to Columbia, Missouri. David Hill, one of the civil defense volunteers, testified that he kicked a small mound of dirt accidentally and discovered Bond's driver's license and three credit cards.

Information obtained in violation of the attorney-client relationship may have led to discovery of Bond's body. However, on the basis of the record in this case we cannot hold the trial court abused its discretion in ruling the evidence relating to Bond's body admissible. *State v. Neal,* 416 S.W.2d 120, 124 (Mo.1967); *see also, State v. Flowers,* 592 S.W.2d 167, 170 (Mo. banc 1979). *Cf. Killough v. United States,* 336 F.2d 929, 933–4 (D.C.Cir.1964); *see also, Brewer v. Williams,* 430 U.S. 387, 406, n. 12, 97 S.Ct. 1232, 1243, n. 12, 51 L.Ed.2d 424 (1977).

The effect of the admission of the credit cards and driver's license was, at worst, minimal. Evidence unrelated to police misconduct supports the following conclusions: That appellant intended to steal a car from Kelly Pontiac; that appellant had in his possession the stolen Firebird in which Bond, with two youths, left the dealership; that a shotgun was found in the Firebird; that the dealer's license plate, with blood on it, was found in the Firebird; that blood was on the spoiler of the Firebird; and that Bond was killed with a shotgun.

In view of these facts and circumstances in this particular case, we declare the failures on the part of the trial court to abide "the requirements of federal organic law," articulated in *Miranda* and *Wong Sun,* harmless. *Cf. Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

The judgment is affirmed.

RENDLEN, MORGAN and HIGGINS, JJ., concur.

DONNELLY, C. J., concurs in separate concurring opinion filed.

WELLIVER, J., dissents in separate dissenting opinion filed.

SEILER and BARDGETT, JJ., dissent and concur in separate dissenting opinion of WELLIVER, J.

DONNELLY, Chief Justice, concurring.

I concur in the principal opinion, but have an observation to make.

The United States Supreme Court, sitting as a Council of Revision, enacted the *Miranda* Rule as "federal organic law" in 1966. *See* R. Berger, *Government by Judiciary* 300–306 (Cambridge, Massachusetts: Harvard University Press, 1977); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); and *North Carolina v. Butler*, 441 U.S. 369, 376, 99 S.Ct. 1755, 1759, 60 L.Ed.2d 286 (1979).

In my view, the Rule should now be repealed by the Court in order to place more value on *a concern for victims* as a component in the social equation. *See* R. Pound, *Criminal Justice in America* 10, 11 (Cambridge, Massachusetts: Harvard University Press, 1945). To borrow from Sidney Hook:

"We wish to reduce the role of violence in human affairs without sacrificing the principles of justice. The extension of the privileges against self-incrimination to absurd lengths by justices who abandoned common sense in a desire to establish a reputation for liberalism has no parallel in any other national legal jurisdiction. To elicit relevant testimony it has required legislation that has enabled some criminal defendants to purchase an undeserved immunity from punishment for very serious crimes. The statistics of violent crimes show that our situation is much too serious to indulge in sentimentalism at the expense of our fellow citizens. When crimes of violence are rare and infrequent we may justifiably lean over backward to protect those accused of serious crime from a possible miscarriage of justice. But it is not justice but only compassion that leads us to say that it is better that nine or ninety-nine guilty men escape punishment for their crime than that that one innocent man be convicted. For that is certainly not doing justice either to the nine or ninety-nine guilty or to their potential victims. When crime is as rampant as it is today, those who invoke this dictum to justify strengthening the rights of the individuals accused of violent crime at the expense of the rights of the potential victims of violent crimes are not even entitled to the self-righteous claim that they are moved by compassion. Compassion, if it is a virtue, must itself be balanced and equitable. Where, we ask, is their compassion for the myriad victims of violent crime? At what point, we ask, do the victims come into the ethical reckoning?" S. Hook, *Philosophy and Public Policy* 135, 136 (Carbondale & Edwardsville, Illinois: Southern Illinois University Press, 1980).

WELLIVER, Justice, dissenting.

I respectfully dissent.

The original basis for the exclusionary rule is to further the principle of judicial integrity, which demands that the courts be isolated from contagious contact with unconstitutional activity.[1] To affirm the conviction in this case and allow the evidence obtained through the clearly perceivable police misconduct to remain intact "would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution." *Weeks v. United States*, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed.2d 652 (1914). "[W]hen flagrant misconduct is involved," as in the instant case, "the normative principle underlying the exclusionary rule—that government should play no part in unlawful activity—is a compelling justification for the exclusionary sanction."[2] The principle of judicial integrity demands that this

---

1. *Terry v. Ohio*, 394 U.S. 1, 12–13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968); Henderson, *Justice in the Eighties: The Exclusionary Rule and the Principle of Judicial Integrity*, 65 Judicature 354 (1982).

2. Mertens & Wasserstrom, *The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law*, 70 Geo.L.J. 365, 405 n. 196 (1981).

Court not act as an accomplice to the violation of the Constitution. *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). "Crime is contagious. If the Government becomes a law breaker, it breeds contempt for the law . . . ." *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), *overruled, Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Although other courts may be eclipsing the underlying rationale for the exclusionary rule by reducing the rule to pragmatic dimensions, this Court need not join in *ad hoc,* result-oriented application of constitutional principles.

> [T]his type of *ad hoc* evaluation is, as it has always been, the deepest problem of our constitutionalism . . . .
>
> . . . .
>
> . . . [T]he main constituent of the judicial process is precisely that it must be genuinely principled, resting with respect to every step that is involved in reaching judgment on analysis and reasons quite transcending the immediate result that is achieved.[3]

The judgment of conviction in this case should be reversed and the cause remanded for further proceedings in which the illegally obtained evidence is suppressed. As much as I regret retrial, I would rather say to the world that judicial integrity and individual rights will be preserved and that deterrence of blatant police misconduct will be furthered than to become a party to violation of the Constitution.

The principal opinion rests its harmless error judgment on the finding of sufficient evidence of guilt in this case. To apply a standard of sufficiency "as a threshold requirement to the raising of constitutional challenges to criminal convictions," however, "is to shield from attack errors of a most fundamental nature and thus to deprive many defendants of basic constitu-

tional rights." *Harrington v. California,* 395 U.S. 250, 257, 89 S.Ct. 1726, 1730, 23 L.Ed.2d 284 (1969) (Brennan, J., dissenting). I, too, have no doubt that the admissible evidence supports a finding of guilt in this case. I am equally confident that a conviction would be obtained upon retrial without use of the evidence obtained illegally. Judicial integrity and individual constitutional rights could be maintained if this principled analysis were undertaken. There is a distinction between reversing on a mere technicality and placing court approval on bad, infectious police procedure. Even if the purpose of the exclusionary rule is viewed as a mere deterrence technique, deterrence can be achieved in this case only by suppressing the illegally obtained evidence. "[C]onsistent application of the exclusionary rule by a reasonable and resolute judiciary could significantly alter police behavior."[4] All that is gained by the principal opinion's tacit approval of the illegal investigations in this case is a conviction without retrial. Retrial is a small price to pay[5] for preserving judicial integrity and constitutional principles.

The need for court intervention for the purpose of maintaining proper standards of law enforcement being so clearly demonstrated in this case, our own failure to intervene will, I fear, be interpreted by our federal brothers as but another invitation to intervene.

Appellant Bonuchi contends that admission of the credit cards and driver's license into evidence was error because they were discovered only through violation of his constitutional rights and, thus, are fruits of the poisonous tree. This point should be ruled in appellant's favor.

It was interrogation when the police asked appellant to accompany them to the cemetery for the purpose of showing them where the credit cards and driver's license were buried. The police did not give appel-

---

3. Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv.L.Rev. 1, 12, 14 (1959).

4. Mertens & Wasserstrom, *supra* note 2, at 393 n. 126.

5. *See id.* at 401.

lant his *Miranda*[6] warnings before their repeated requests or before the trip to the cemetery. Although appellant consented to the trip upon the condition that his lawyer approved, Captain Watson falsely told appellant that he had contacted his attorney and that the attorney had given his consent. Under this subterfuge, it cannot be said that the attorney-client privilege was not violated. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *State v. Oldham*, 618 S.W.2d 647 (Mo. banc 1981). Moreover, the artifice of having the civil defense volunteers "find" the credit cards and driver's license while Captain Watson was nearby in no way militates against the conclusion that the items were found only as a direct result of the illicit interrogation of appellant. Under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the credit cards and driver's license and the evidence surrounding their discovery should not have been admitted against appellant. The only real significance of the credit cards and driver's license is that their admission condones and tolerates the misconduct of the police. These items are fruits of the poisonous tree.

The record is more than replete with recognition of the bad faith of the Oklahoma police officers in their investigation and their treatment of appellant. No exception to the exclusionary rule, be it "inevitable discovery," "independent source," or "attenuation," would permit admission of the complained-of evidence that they obtained.

Moreover, the techniques of the Oklahoma police infected the Columbia, Missouri, investigation leading to discovery of the victim's body. Sheriff Foster's discovery of the victim's body undoubtedly was accelerated by appellant's inadmissible disclosure of the location of the body and a route thereto. Appellant first disclosed the location by drawing a map for his attorney, whom the El Reno police officers compelled to turn it over to the Oklahoma authorities. The Oklahoma police attempted to direct the Columbia authorities, who had been searching for several days, to the body by telephone conversations in which the map was explained. With even this failing to lead the Columbia investigators to the body, Columbia Detective Bob Muse engaged in a telephone conversation with appellant. Appellant at the time had not received the *Miranda* warnings, and counsel was not present. Without condoning any of the Oklahoma or Missouri police misconduct described, it is my opinion that "evidence of where the body was found and of its condition [is] admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited." *Brewer v. Williams*, 430 U.S. 387, 406–07 n.12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 404 (1977). *See Killough v. United States*, 336 F.2d 929 (D.C.Cir.1964); *Wayne v. United States*, 318 F.2d 205 (D.C. Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *Williams v. Nix*, 528 F.Supp. 664 (S.D.Iowa 1981); *State v. Williams*, 285 N.W.2d 248 (Iowa 1979), *cert. denied*, 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980). In *Killough*, the victim's body was admitted in the face of police misconduct when it was found that the body was discovered close to a road, near a densely populated area, and close to the defendant's girlfriend's address. In *Wayne*, the court held that the coroner would sooner or later have obtained the body. *See generally* Kaplan, *The Limits of the Exclusionary Rule*, 26 Stan.L.Rev. 1027 (1974). In this case, it cannot be said that the body would not ultimately have been discovered. It was found during the hunting season, in an area frequented by hunters. It was about thirty feet from the center of a county gravel road. There was a path of trampled weeks from the road to the body. Blood spots were visible on the road surface.

The inevitable discovery exception to the exclusionary rule would admit evidence concerning the discovery, location, and condition of the victim's body. Although Detective Muse's conduct was of no higher caliber

---

6. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

than that of the Oklahoma authorities, the inevitable discovery exception saves the evidence of the victim's body, saves this case, and would permit retrial and, undoubtedly, conviction. The inevitable discovery, independent source, and attenuation exceptions, do not reach the other hidden evidence. Even at this late date, justice can prevail and the integrity of both law enforcement and the judicial process can be vindicated by a retrial of appellant. Appellant's conviction should be reversed and the cause remanded for further proceedings.