**STATE of Missouri, Respondent,**

v.

**George Edward TIBBS, Appellant.**

**No. 15661.**

Missouri Court of Appeals,
Southern District,
Division One.

May 10, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 31, 1989.

Application to Transfer Denied
Aug. 1, 1989.

Joseph Howlett, Shaw, Howlett & Schwartz, Clayton, for appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found appellant guilty of (1) the class D felony of unlawful use of a weapon, § 571.030.1(1), RSMo 1986, in that he knowingly carried a .38 revolver concealed upon or about his person, and (2) the class D felony of resisting arrest, § 575.150.1(1), RSMo 1986. The jury assessed punishment on the weapon charge at one year's impris-onment and a fine in an amount to be determined by the court; the jury assessed punishment on the resisting arrest charge at one year's imprisonment. The trial court imposed the terms of imprisonment assessed by the jury, ordering that they run consecutively, and assessed a $1,000 fine on the weapon charge.

Appellant presents three points on appeal: (1) the trial court erred in failing to direct a verdict of not guilty on the weapon charge in that the revolver was not concealed and there was no evidence from which the jury could find that the revolver was not discernible by ordinary observation, (2) the information on the resisting arrest charge was defective in failing to plead with particularity the facts relied on by the State to establish that appellant threatened violence or physical force, hence the trial court failed to acquire jurisdiction over said charge, and (3) there was insufficient evidence from which a jury could find that appellant knew he was being arrested and that the person attempting to effect the arrest was a police officer and was in fact making an arrest, and there was no evidence that appellant used violence or physical force.

In determining the sufficiency of the evidence to support the verdicts we view the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdicts, and disregard all contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that appellant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

So viewed the evidence establishes that on May 19, 1987, one Frank Miller, a resident of Springfield and a business acquaintance of appellant, was—unknown to appellant—assisting officers of the Narcotics Violation Investigative Unit of the Springfield Police Department. That evening Miller phoned appellant at the latter's home in De Soto about purchasing marihuana. Appellant agreed to deliver marihuana to Miller.

Appellant started to Springfield the next day driving a 1987 Chrysler LeBaron turbocoupe carrying a brown paper grocery sack containing "several bags" of marihuana, two sets of scales, and "rolling papers." On the outskirts of Springfield appellant concealed the sack in some weeds by a road sign on an access ramp at the intersection of highways 60 and 65. Appellant then proceeded to Miller's place of business and talked to him about the sale.

Miller, unbeknownst to appellant, thereafter phoned detective Steve Ijames, a member of the Narcotics Violation Investigative Unit, informing Ijames that appellant was in town and had three pounds of marihuana for sale. Arrangements were ultimately made for a meeting between Ijames and appellant.

The rendezvous was to take place at 11:00 p.m., at an apartment complex at 1438 East Elm. The sergeant in charge of Ijames' unit arranged for officers in "undercover" vehicles to keep Ijames and appellant under surveillance. Ijames was driven to the meeting site by his sergeant, arriving "around eleven o'clock." Ijames' testimony:

"Q How were you dressed?

A As I recall, I had blue jeans and a black, long-sleeved T-shirt.

Q How about your hair?

A My hair was considerably longer and I had a beard, and I believe I had an earring."

Ijames waited alone a few moments in front of the apartment complex. Then two automobiles arrived: appellant's Chrysler driven by appellant, the lone occupant, and a Cadillac driven by Miller, the lone occupant. Miller exited the Cadillac, and he and Ijames walked to the Chrysler, stopping at the driver's door. Through the open window Ijames and appellant discussed the price ($1,600 per pound), Ijames complaining it was too high and appellant insisting the marihuana was excellent. The conversation also concerned "how the buy would go down."

Appellant handed Ijames a "roach," described by Ijames as a "very small marijuana cigarette," which Ijames lit and passed back and forth with Miller. After further discussion "about how we were going to do the deal," appellant told Ijames to get in appellant's car. Asked what occurred next, Ijames responded:

"I walked around the passenger side, opened the door and sat down in the front seat of the vehicle, and Mr. Miller followed me around. I leaned forward to lift the back seat area and let Mr. Miller get in and the car pulled away from the curb.

Q Did Mr. Miller get in the car?

A He did not."

Appellant's vehicle proceeded east followed by Miller in his Cadillac, then turned south. Eventually, at Ijames' request, appellant stopped at a package liquor store. Asked the purpose of the stop, Ijames testified:

"Basically, I wanted to buy time to make sure a surveillance car was—it's not possible to look over my shoulder and see if the other officers were there.

I knew if I could get out of the vehicle for a moment, I knew I could recognize the surveillance vehicles.

. . . .

There were about seven other policemen that were following me ... in different types of non-police looking vehicles...."

Ijames, upon seeing one of the surveillance detectives, went in the store, purchased a "pack of beer," and reentered appellant's automobile. Appellant then drove south and ultimately "left the city limits." Ijames' testimony:

"Q What conversation are you having as you are driving along out south of the city?

A We had a pretty lengthy conversation concerning whether or not I was a police officer or a cop or nark, was the terminology he was using, and made numerous statements about how he was concerned about the deal and didn't know me and I didn't know him and that he had come a long way down here and hadn't planned on doing the deal with somebody he didn't know. . . ."

Ijames told appellant he (Ijames) was not a police officer.

Appellant turned north on the access ramp to highway 65, stopped at the road sign, opened the door, and pulled the bag of marihuana out of the weeds. Appellant dropped the bag between Ijames' legs and stated there were scales in it. Ijames opened the bag, removed a set of scales, and began weighing a pound of marihuana as appellant drove north on highway 65. After Ijames weighed the pound appellant asked to "see some money." Ijames handed appellant $2,650. Appellant turned on the dome light and began counting the money as he continued to drive.

Ijames realized that at a price of $1,600 per pound the $2,650 was not going to be sufficient to pay for two and three-quarters pounds of marihuana, the quantity he and appellant had been discussing. Ijames explained, "I had planned to arrest him before he got done counting the money."

Ijames and appellant had been "listening to some tapes" as they rode. Ijames reached into the back seat area as though he were getting a tape, and "just continued going right on into the back seat." At that point Ijames removed his service revolver and handed appellant a "credentials case" with Ijames' badge and police identification. Ijames testified:

"I said, George, take a look at the ID. I'm a Springfield police detective. Look at the credentials case and then pull the car over. You're under arrest."

Appellant's vehicle was approaching the exit from highway 65 to Interstate highway 44 as Ijames announced the arrest. Instead of stopping, appellant turned onto Interstate 44 and accelerated "up to about 70." Ijames testified he admonished appellant to pull over and stop, as he "was just going to get himself in deeper trouble." Appellant remained mute and continued driving. Ijames' testimony:

"Q Did he make any reactions at all to the fact that you'd identified yourself as a police officer, other than driving up the interstate?

A He did a few moments later. Initially, there wasn't any reaction other than driving down 44.

Q What was that reaction?

A That he couldn't go to jail, that he would rather 'go out' was his terminology.

We discussed this for the next 30 or 40 miles.

. . . .

Q What did you feel?

A I felt like we were going to run into a bridge abuttment [sic]. The going out seemed to me to be something I didn't want to get involved in. It was a desperation-type of statement.

I would rather go out. I can't go to jail. I'd rather take us out.

Q How many times did he say something like that, I'd rather take us out?

A Five or six during the trip.

Q Did he have any other reaction other than verbal reaction?

A Probably two or three minutes after we turned on 44, he had both hands on the wheel. He removed his right hand from the wheel and just very slowly began to lower it down to his right leg; and as I recall, I put my arm around his neck and put my gun to the back of his ear and said, get your hand back up on the wheel, which he did.

At that point, I leaned over to look what he was reaching for and I could see the back strap of a revolver underneath his right thigh.

Q Prior to that time, had you seen a gun around or near or on the [appellant]?

A No, I had not.

Q Or seen any sign that he had one?

A No.

. . . .

Q And what was the [appellant's] reaction to your telling him not to—

A He put his hand back on the wheel.

Q What happened then, sir?

A We continued down the highway . . . ."

Meanwhile, Ijames' sergeant and other officers in undercover vehicles had been following appellant's automobile. The sergeant radioed one of the officers to approach appellant's car to see whether Ijames was in danger. The officer performed the maneuver and advised the sergeant "that everything looked fine."

The sergeant allowed the situation "to continue for some distance." He explained:

"The problem was the speed. I couldn't very well stop the suspect vehicle without endangering both he and the officer, nor did I have the capability at the time because we was doing it all with sport cars and broncos and that sort of thing, all undercover vehicles.

Eventually we did manage to get one highway patrolman to move up so that the suspect would know, in fact, that it was police officers, and staged a moving road block."

Two undercover vehicles pulled ahead of appellant's vehicle, one in each lane. The highway patrol vehicle, in the inside lane, activated its red lights and siren and moved alongside appellant's vehicle. The sergeant's vehicle and another undercover vehicle moved behind appellant's vehicle, thereby surrounding it. The officers' vehicles then began slowing down and veering to the right, forcing appellant to drive onto the shoulder and stop. At that point, according to Ijames, appellant had driven about 44 miles since turning onto the Interstate. The stop occurred just before reaching Lebanon.

As one of the detectives ran toward appellant's automobile, Ijames alerted the detective that appellant had a gun. The officers opened appellant's car door and pulled him out. Ijames "grabbed the gun off the seat." It was a Colt Detective Special .38

caliber revolver, and was loaded. The weight of the marihuana in the grocery sack turned out to be 945.4 grams (2.08 pounds).

 Appellant, in support of his first point, emphasizes that concealment is an essential element of the crime of carrying a concealed weapon. *State v. Tate,* 416 S.W.2d 103, 105[1] (Mo.1967); *State v. Duggins,* 284 Mo. 633, 225 S.W. 987, 988 (1920). Generally, the test of concealment is whether the weapon is discernible by ordinary observation. *State v. Bordeaux,* 337 S.W.2d 47, 49[4] (Mo.1960); *State v. Cavin,* 555 S.W.2d 653, 654[1] (Mo.App. 1977). A weapon is not concealed simply because it is not discernible from a single vantage point if it can be clearly seen from other positions. *State v. Crews,* 722 S.W.2d 653, 654[2] (Mo.App.1987); *Cavin,* 555 S.W.2d at 654[2]. However, a weapon may be concealed if it is discernible from only one particular vantage point. *Crews,* 722 S.W.2d at 654[2]; *Cavin,* 555 S.W.2d at 654[2]; *State v. Miles,* 124 Mo.App. 283, 101 S.W. 671, 672 (1907). Whether a weapon is on or about the person, as forbidden by § 571.030.1(1), is determined by whether it is in such close proximity to the accused so as to be within his easy reach and convenient control. *State v. Simmons,* 716 S.W.2d 427, 430[7] (Mo.App.1986); *State v. Jackson,* 645 S.W.2d 725, 727[4] (Mo.App. 1982).

 Appellant maintains there was no evidence from which the jury could have found that appellant's revolver was not discernible by ordinary observation. Appellant directs us to the following passage from the cross-examination of Ijames:

"Q Did you tell either one of these prosecutors that [appellant] had both hands on the steering wheel and that you saw the gun under his right leg and you told him to keep—you told Tibbs to keep his hands on the steering wheel. Did you tell either one of these prosecutors that?

A I don't recall that, no. It's possible, the scenario you described, that I could have said that. I recall to the best

of my recollection that the first insistence to keep his hands on the wheel was after it came off, but there were several things going on at that time.

He may have had his hands on the wheel the first time that I saw the gun. I don't think that's what happened but it's possible."

Appellant argues that a "reasonable synopsis" of Ijames' testimony would be that appellant's gun was lying on the front seat partially visible and under his right leg. That being so, says appellant, the State's evidence affirmatively proved his weapon was not concealed, but was instead discernible by ordinary observation. Appellant relies on *State v. Payne,* 654 S.W.2d 139 (Mo.App.1983), in support of this hypothesis.

We find *Payne* inapposite. There two police officers, in broad daylight, approached an automobile occupied by the accused, looked in, and immediately saw what appeared to be the butt of a gun visible underneath the armrest. Reversing a conviction for carrying a concealed weapon, the Eastern District of this Court held that by their unequivocal testimony both officers observed a recognizable part of the firearm in plain view. 654 S.W.2d at 141. Emphasizing that the applicable statute (then § 571.115, RSMo 1978) did not prohibit carrying a partially concealed weapon, but forbade only carrying a concealed weapon, the opinion declared the State's evidence insufficient to support a guilty verdict. *Id.* at 141[4].

Unlike the officers in *Payne,* Ijames did not see appellant's gun upon initial confrontation. Appellant, in his testimony, admitted his pistol was in his automobile when Ijames got in at the apartment complex. While appellant avowed the "whole back butt of the gun and the trigger assembly" were visible, the jury was not required to believe that testimony. *State v. Rima,* 395 S.W.2d 102, 104[1] (Mo. banc 1965).

Ijames' uncontradicted testimony was that he was seated in the front of appellant's automobile from the time he entered it until he exited at the package store, and

that he occupied the same position upon reentering appellant's car after buying the beer. While the amount of time that elapsed between the departure from the apartment complex and the retrieval of the marihuana on the highway 65 ramp is not shown, several minutes were undoubtedly consumed in going from the apartment complex to the package store, buying the beer, and going from the package store to the marihuana site.

Additional time was obviously required for Ijames to weigh the marihuana and hand appellant the $2,650, and it must be remembered that the dome light was on while appellant was counting the money. During all this time Ijames was in the front seat to appellant's right. It is clear that up to this point Ijames had not observed appellant's pistol. As to when he first observed it, Ijames' testimony included this:

"... I didn't see the entire gun until after he was taken out of the car, but I saw a portion which I recognized as a gun probably two minutes after I placed him under arrest, perhaps a little bit less, when he had taken his hand off the wheel just very slowly. That's what caused me to look down.

He very slowly lowered his hand to his leg. I looked to see what he was reaching for. I felt it was probably some kind of a weapon. That's why I instructed him to put his hand on the wheel, and I saw the backstrap, which I recognized as that of a gun."

It is clear from the above testimony that Ijames first saw what he believed to be a weapon only after appellant had turned onto Interstate 44, and that by this time Ijames had moved from the front seat of appellant's automobile to the back. Furthermore, Ijames saw the "backstrap" only after his attention had been called to it by the movement of appellant's hand.

In *Miles,* 101 S.W. 671, the accused (a passenger seated on a train) held a pistol in one hand, partially concealed by his vest and pants. According to the prosecution's evidence no part of the pistol was in open view, and it could be seen only by looking in a certain direction and from a certain

point. The accused's conviction for carrying a concealed weapon was affirmed, the appellate court holding that whether the pistol was concealed was a jury question, and that the evidence was sufficient to support the verdict. *Id.* at 672.

In *Bordeaux*, 337 S.W.2d 47, a police vehicle occupied by two officers was pursuing an automobile operated by the accused at night. The officers pulled alongside the accused and told him to pull over. He slowed, but then accelerated and the chase continued. During the pursuit the officers saw the accused throw a revolver from his car. That was the first they had seen of the gun. Affirming a conviction for carrying a concealed weapon the appellate court pointed out that the officers saw no weapon when they first drew alongside the accused's automobile, and saw the weapon only after the accused took his right hand off the steering wheel, reached down, and came up with the revolver which he immediately jettisoned. *Id.* at 49. This evidence, said the court, was sufficient proof of concealment. *Id.*

In *State v. Murphy*, 610 S.W.2d 382 (Mo. App.1980), an off-duty police officer was performing security duty in an apartment project around 2:40 a.m. While ascending some stairs he saw two men on a landing watching him. Both were wearing jackets and had their right hands in or near their right front jacket pockets. The officer saw no weapons but was wary because of the hour and circumstances. The officer passed the men, carefully watching their right arms, and proceeded to the floor above. The officer then moved his service revolver, badge and identification to more readily accessible positions and went downstairs to question the men. Upon reaching them the officer directed them to stop, and identified himself as a police officer. The man nearest the officer made a quarter turn and looked back toward the officer. The officer, who was watching the man's right hand which was still in his pocket, saw the brown handle of an as yet unidentified firearm. This was the first time he had seen the weapon. The officer exhibited his revolver and police identification, and ordered the man to raise his arms.

The officer then removed a .357–Magnum pistol from the man's right jacket pocket. Affirming a conviction for carrying a concealed weapon, the Eastern District of this Court emphasized that the officer did not see the weapon except for a brief moment as the accused turned back toward him, although the officer had the opportunity to see the accused from several other angles and had been particularly observant of the accused's right arm and hand. *Id.* at 384. Pointing out that a weapon may be concealed if it is discernible only from one particular vantage point, the court held the evidence sufficient to support the verdict. *Id.* at 384–85.

In the instant case it is clear that Ijames was beside appellant in the front seat of appellant's car for a considerable period of time, during part of which the dome light was on, and that Ijames at no time saw anything he suspected was a weapon. It was only after (a) Ijames had changed positions, moving into the back seat, (b) Ijames' attention had been drawn to appellant's right leg by the movement of appellant's right hand, and (c) Ijames had "leaned over" to see what appellant was reaching for that Ijames saw part of appellant's pistol extending out from beneath his right leg. Following *Miles, Bordeaux* and *Murphy*, we hold that whether appellant's pistol was concealed was a jury question, and that the evidence was sufficient to support the verdict. Appellant's first point is denied.

Appellant's second point reads:

"The information on [the resisting arrest] count ... was defective in failing to plead with particularity facts used to rely on the allegation that the [appellant] threatened violence or physical force. Because said information was defective, trial court failed to obtain jurisdiction, and the verdict on resisting arrest was a nullity."

The count of the information charging appellant with resisting arrest reads:

"The Prosecuting Attorney ... charges that the defendant ... committed the class D felony of resisting arrest

... in that on or about the 21st day of May, 1987, in the County of Greene, State of Missouri, Officer Steve Ijames ... was making an arrest of George Edward Tibbs for sale of a controlled substance, and the defendant, knowing that the officer was making an arrest and for the purpose of preventing the officer from effecting the arrest, resisted the arrest of defendant by using or threatening to use violence or physical force."

Appellant correctly asserts that if the information be insufficient the trial court acquires no jurisdiction over the accused and whatever transpires thereafter is a nullity. *State v. Gilmore*, 650 S.W.2d 627, 628[2] (Mo. banc 1983), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). The test of sufficiency of an indictment or information is whether it contains all essential elements of the offense as set out in the statute and clearly apprises the accused of facts constituting the offense. *Gilmore*, 650 S.W.2d at 628[3].

Appellant points out that the count of the information charging him with resisting arrest avers that he did so by using or threatening to use violence or physical force. Appellant maintains the count is defective in that it does not state how or in what manner he resisted the arrest, consequently he was not informed as to what the allegations would be and as to what form his defenses might take as to the alleged violence or physical force.

Section 575.150, RSMo 1986, provides, in pertinent part:

"1. A person commits the crime of resisting ... arrest if, knowing that a law enforcement officer is making an arrest, for the purpose of preventing the officer from effecting the arrest, he:

(1) Resists the arrest of himself by using or threatening the use of violence or physical force or by fleeing from such officer; or

...."

Rule 23.01(b)[1] provides:

"The ... information shall:

....

2. State plainly, concisely, and definitely the essential facts constituting the offense charged;

...."

Rule 23.01(e) provides:

"All ... informations which are substantially consistent with the forms of ... informations which have been approved by this Court shall be deemed to comply with the requirements of this Rule 23.01(b)."

MACH–CR 29.60 [1983 Revision], approved by the Supreme Court of Missouri April 30, 1982, and effective January 1, 1983 (see MACH–CR pages XII–C, XII–D, and 29–20), is the form for an information charging resisting arrest in violation of § 575.150, RSMo 1986. It reads:

"The ... (Prosecuting Attorney) ... charge(s) that the defendant ... committed the ... (class D felony) of (resisting) ... arrest ... in that ... (on or about) [date] in the ... (County) of _____, State of Missouri, ([name of law enforcement officer], a law enforcement officer, was) ... making an arrest of (defendant) ... for [name offense], and the defendant, knowing that the officer(s) (was) ... making an arrest and for the purpose of preventing the officer(s) from effecting the arrest, (resisted) ... the arrest of (defendant) ... by ... (using or threatening to use violence or physical force)."

It is manifest that the count of the information in the instant case charging appellant with resisting arrest scrupulously followed MACH–CR 29.60 in alleging that appellant resisted arrest "by using or threatening to use violence or physical force." That is the phrase appellant attacks as insufficient in his second point.

Section 575.150.1(1), quoted *supra*, provides that a person commits the crime of resisting arrest if, knowing that a law enforcement officer is making an arrest, for the purpose of preventing the officer from effecting the arrest, he resists the arrest of himself "by using or threatening the use of violence or physical force." That phrase is

---

1. Rule references are to Missouri Rules of Criminal Procedure (18th ed. 1987).

virtually identical to the phrase challenged by appellant.

▌ As a general rule it is enough to charge the offense in the language of the statute alleged to be violated if the statute states all the constituent elements of the offense. *State v. O'Connell*, 726 S.W.2d 742, 746[5] (Mo. banc 1987). If, however, the statute uses generic terms in defining the offense, it is necessary to recite sufficiently the conduct constituting the offense in order to accomplish the purpose of the information. *Id.*

The count of the information charging appellant with resisting arrest set forth the date of the offense and the county in which it was committed, named the law enforcement officer making the arrest, identified the person being arrested, specified the crime for which the arrest was being made, averred that appellant resisted the arrest for the purpose of preventing the officer from effecting it, and alleged that appellant did so by using or threatening to use violence or physical force.

Rule 23.01(b), quoted in part earlier, lists the requirements for the content of an information, and Rule 23.01(e), quoted earlier, provides that compliance with the forms for informations approved by the Supreme Court of Missouri shall be deemed to satisfy the requirements of Rule 23.01(b). *State v. Burch*, 740 S.W.2d 293, 294–95[1] (Mo.App.1987); *Pelham v. State*, 713 S.W.2d 614, 617 (Mo.App.1986). In *Burch* the accused was convicted of two counts of sodomy. The indictment substantially followed the MACH–CR form for sodomy charges. On appeal the accused contended that the indictment used vague, indefinite and generic language, preventing him from adequately preparing his defense, in that the indictment failed to plead the exact nature of the deviate sexual intercourse. Affirming the conviction, the Eastern District of this Court held the specific combination of body parts through which the

sexual act is effected need not be particularized in order to enable the accused to meet the charge and bar further prosecution. 740 S.W.2d at 295. In *Pelham* a prisoner sought post-conviction relief from a conviction of first degree assault; the indictment had charged him with causing serious physical injury to the victim by striking him with a dangerous instrument. The prisoner contended, among other things, that the indictment was defective in that it failed to explain what the dangerous instrument was. Noting that the indictment complied with the MACH–CR form for a charge of first degree assault, this District of this Court held the indictment was not defective. 713 S.W.2d at 617[4].

▌ Measured by *Burch* and *Pelham*, the count of the information charging appellant with resisting arrest was sufficient. If appellant needed to know the precise violence or physical force he was alleged to have used or threatened, he could have filed a motion for a bill of particulars per Rule 23.04.[2] Appellant's second point is denied.

Appellant's third point is:

"There was insufficient evidence from which a jury could find that [appellant] knew that he was being arrested and that policeman Ijames was a police officer and that he was, in fact, making an arrest. There was no evidence of violence or physical force used. The trial court erred in submitting said issue to the jury and in failing to grant a directed verdict on the charge of resisting arrest."

▌ We first consider appellant's premise that there was insufficient evidence to support a finding that he knew he was being arrested and that Ijames was a police officer and was in fact making an arrest. Besides the evidence previously recounted, Ijames' testimony disclosed that Miller had a commission as a Greene County deputy

---

2. The docket sheet shows appellant filed a motion for a bill of particulars in the trial court four months before trial. As the motion is not included in the record on appeal, we cannot determine whether it was directed toward the resisting arrest count. In addition to the two crimes for which appellant was convicted, the information charged him with selling marihuana. The jury acquitted him of that charge. No error is assigned on appeal regarding the motion for bill of particulars.

sheriff. Appellant testified he (appellant) was concerned about Miller's "badge," and upon arriving at Springfield refused to bring the marihuana to a site chosen by Miller—a hospital parking lot—for fear of being arrested.

Additionally, Ijames testified that when he handed appellant his (Ijames') credential case simultaneously with announcing the arrest, he told appellant to look at the picture and then look in the mirror. Ijames explained, "I wanted him to see my face and the face on the picture." Ijames observed that appellant had the credential case open and that appellant looked at Ijames in the mirror. Ijames also testified he told appellant there was a United States Marshal's commission beneath the picture, which commission granted Ijames authority "wherever we were." Appellant, according to Ijames, "pulled out" the Marshal's commission.

Prior to the time Ijames presented his credentials, it is clear that appellant was concerned about whether Ijames was a peace officer. Appellant, in his testimony, acknowledged that upon leaving the package liquor store he asked Ijames "if he was a police officer or a narcotics agent or any kind of officer."

It must also be remembered that after Ijames told appellant he was under arrest, appellant, according to Ijames, said he (appellant) "couldn't go to jail," and that he would rather "go out." Obviously appellant would not have feared Ijames would jail him unless appellant believed Ijames was a law enforcement officer.

Appellant's wariness about the danger of arrest from the outset, coupled with his declaration that he couldn't go to jail and would rather go out after Ijames identified himself as a police officer and announced the arrest, constituted sufficient evidence to support a finding that appellant knew Ijames was a police officer and that he was arresting appellant.

■ The second contention advanced by appellant in his third point is that there was no evidence he used or threatened to use violence or physical force. We disagree.

Ijames' testimony established that appellant, upon being told he was under arrest and to stop his car, drove some 44 miles at a speed of up to 70 miles per hour, and was halted only after being surrounded by several officers' cars and forced to stop. During the journey appellant, according to Ijames, said he couldn't go to jail and would rather go out, a statement Ijames interpreted as indicating appellant was contemplating driving into a bridge abutment. Additionally, according to Ijames, appellant moved his right hand toward his right leg, beneath which his pistol was situated, stopping only on command by Ijames.

Among the definitions of the verb "threaten" we find this: "to give signs of the approach of (something evil or unpleasant): indicate as impending." Webster's Third New International Dictionary, G. & C. Merriam Company (1976). We hold that the above evidence was sufficient to support a finding that appellant resisted his arrest by threatening the use of violence.

Although not set forth in appellant's third point, one final contention appears in the argument following it. Appellant avers that inasmuch as the jury found him not guilty of selling marihuana[3] the State failed to prove the felony for which Ijames arrested appellant, hence he could not have been guilty of the felony of resisting arrest. This contention appears nowhere in appellant's motion for new trial; consequently, it has not been preserved for appellate review. Rule 29.11(d); *State v. Peterson*, 518 S.W.2d 1, 3[2] (Mo.1974); *State v. Carr*, 499 S.W.2d 788, 790[4] (Mo.1973).

Appellant's third point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.

**3.** Footnote 2, *supra.*