STATE of Missouri, Respondent,

v.

John Lee LEWIS, Appellant.

No. 17506.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 10, 1992.

Brad B. Baker, Columbia, for appellant.

William L. Webster, Atty. Gen., Rudolph R. Rhodes, IV, Asst. Atty. Gen., Jefferson City, for respondent.

MONTGOMERY, Judge.

Defendant was charged with second degree murder under § 565.021.1[1] for the death of the victim, Johnny L. Stirewalt. By amended information Defendant was later charged as a prior offender under § 558.016 and § 557.036.4. A jury found Defendant guilty of involuntary manslaughter, § 565.024.1(1). He was sentenced to seven years' imprisonment.

Defendant raises two points on appeal. He first alleges the trial court erred by overruling his motion for judgment of acquittal because there was insufficient evidence to convince a jury that Defendant caused the victim's death.

We decide the first issue, as explained in *State v. Seeger,* 725 S.W.2d 39, 40 (Mo.App. 1986):

> In deciding that issue, we consider the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan,* 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald,* 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that appellant was guilty. *State v. Bonuchi,* 636 S.W.2d 338, 340 (Mo. banc

1982), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

About 8:30 a.m. on April 21, 1990, the victim called his mother asking her to bring his medication to him. In 1981, Defendant was injured at work and since that time he suffered seizures for which he took the drugs Dilantin and Phenobarbital. The victim also had a drinking problem. After meeting her son, his mother took him to a liquor store where he purchased a six-pack of beer. His mother then took him to Central Park in Carthage where the victim was left at his request.

At age 17 the victim was in a motorcycle accident suffering severe injuries to his left side. His left leg was about an inch and a half shorter than his right, and his left arm was limited in motion. At his death the victim was 38 years old, weighed 123 pounds and was approximately five feet ten inches tall.

Shortly after noon on April 21, 1990, Mike Grieshaber, who lived across the street from Central Park, was on his front porch. His attention was directed to the park by loud voices. He saw two men and a female involved in an argument. He recognized one man that he had previously observed in the park. That man was later determined to be the Defendant. Grieshaber testified the Defendant either pushed or struck the man standing in front of him, which he described as "pretty small" compared to Defendant. Grieshaber observed the small man strike the ground with such force that his feet came up, and he heard his head strike the ground with a sound like dropping a bowling ball on a carpet. He further described the sound as a loud thud with a crack to it. Grieshaber saw the Defendant go to the side of the victim and stomp on him a couple of times in the upper body area. Then the Defendant looked at him for a second and walked over to a picnic table to sit down. Grieshaber described the distance from his porch to

1. Statutory references are to RSMo 1986.

the scene as approximately 280 feet. The witness then went back inside his home and returned to the porch in about ten minutes. He looked back to the park and the victim was still lying in the same position. He walked over to check on the victim and saw the Defendant still in the park. After viewing the victim, Grieshaber decided to contact the police. Before he could do so, a police officer arrived on the scene.

Carthage police officer Bill Hawkins arrived at the scene at 1:37 p.m. and observed the victim lying unconscious on the ground. He unsuccessfully attempted to arouse him. He then called for an ambulance which transported the victim to the emergency room of McCune–Brooks Hospital. The officer talked to Grieshaber who pointed out the Defendant. Hawkins placed the Defendant under arrest on probable cause for assault. He read Defendant his Miranda rights and asked him what happened. Later, Defendant stated, "Well, he hit me first."

At the police station Detective Guy Blankenship interviewed Defendant who was again advised of his Miranda rights. Defendant stated that he had an argument with the victim over a cigarette lighter. He stated the victim hit him first, and he hit the victim back "very hard." He admitted that he was very mad and probably kicked him after he had fallen to the ground flat on his back.

Upon arrival at the emergency room, Dr. Joseph Quay determined the victim was essentially in a coma. He was unconscious and unresponsive to painful stimuli. His blood alcohol content was determined to be "246 milligram percent." The victim was admitted to the intensive care unit where he was unable to move his left arm and left leg after he awakened. Dr. Quay testified such condition was consistent with an injury to the right side of the brain.

Later that evening the doctors determined the victim's injuries were significant enough to require the care of a neurosurgeon. The victim was transferred to St. John's Hospital in Joplin, Missouri, for further treatment by Dr. Majzoub.

Dr. Majzoub performed surgery on the victim the next day after determining his injury to be an acute subdural hematoma. He determined that the victim previously had surgery on his head several years before where he had sustained a "bleed" on the brain and contusions to the brain that required corrective surgery. Dr. Majzoub testified that as a result of the previous surgery the victim's brain developed some atrophy and shrinkage. Such condition caused the victim to be more likely to have future bleeding or hematomas in the brain. During the operation the doctor found a membrane in the right frontal parietal area which indicated that the victim had suffered bleeding in that area perhaps three weeks previously. He also found new bleeding in the same place. Dr. Majzoub testified that alcoholics, such as the victim, are more likely to suffer brain injuries due to their tendency to fall and sustain trauma to the head. He stated a trauma to an alcoholic could be minor or moderate and produce bleeding on the brain. He further described the victim's injury as a contre-coup injury which occurs when force is applied to one side of the brain and the opposite side develops bruising. A CAT scan on the victim revealed such an injury. After the surgery, the victim died on April 26, 1990.

Dr. John Esther, a pathologist, performed an autopsy on the victim on April 27, 1990. His initial findings were that the victim had a rather massive hemorrhage within his skull and also had degeneration, or infarction, of a portion of the skull related to the hemorrhage. Further examination of the brain revealed the victim sustained an extensive hemorrhage which involved the right side of the brain. Dr. Esther found a compression of the brain which forced it downward into the upper portion of the base of the skull. This produced compression of the blood vessels around the base of the brain, reducing blood supply and producing actual infarction, or death of the right side of the brain. Compression is due to bleeding occurring within the skull which ordinarily contains only the brain and spinal fluid. With the addition of blood it produces pressure on

the brain which can displace the brain by moving it downward. The pathologist testified that it was not a reasonable possibility that the fatal injury to the victim occurred prior to the afternoon of April 21, 1990. He stated it was his opinion that the fatal injury occurred within 24 hours prior to the surgery performed by Dr. Majzoub on April 22, 1990. Finally, he testified the victim's injuries were consistent with him striking the ground.

Initially, Defendant argues the evidence failed to show the victim's death occurred as a result of an assault by Defendant and not from other causes. In support of this argument, we assume Defendant cites *State v. Millin*, 318 Mo. 553, 300 S.W. 694 (1927), and *State v. Feger*, 340 S.W.2d 716 (Mo.1960). We make this assumption because these cases immediately follow Defendant's statement on lack of causation.

*Millin* has no application to Defendant's causation argument. There, a manslaughter charge was brought under Mo.Rev.St. § 3236 (1919). At issue was an instructional error in the definition of "culpable negligence," and reversal was solely on that basis.

*Feger* at least has a causation issue but lends no assistance to Defendant. In *Feger*, a manslaughter conviction resulted from defendant's involvement in a three-car accident. He contended there was no evidence that the decedent was alive at the time of the collision or that the death did not result from an unavoidable accident. The court found ample evidence on both issues to hold against defendant.

More to the point the State relies on *State v. Allen*, 710 S.W.2d 912 (Mo.App. 1986). That Court said:

> These cases establish the rule that where one inflicts an injury on another, he is guilty of homicide if the injury contributes mediately or immediately to the death of such other, and the fact that other causes contribute to the death does not relieve the actor of responsibility: *State v. Butler*, 534 S.W.2d 832, 835–836 (Mo.App.1976); *State v. Williams*, 588 S.W.2d 70, 74–75 (Mo.App.1979); *State v. Daugherty*, 631 S.W.2d 637, 640 (Mo.

1982); and *State v. Bolder*, 635 S.W.2d 673, 680 (Mo. banc 1982).

*Id.* at 917.

In *Allen*, defendant contended the evidence failed to show that his striking Mr. Hudnall caused his death which defendant says resulted from a heart attack. Defendant's conviction was upheld on evidence which revealed defendant struck and stabbed to death Mrs. Hudnall. Defendant's accomplice struck Mr. Hudnall twice on the head with the butt of a knife which caused him to fall to the floor. Two days later Mr. Hudnall was found alive, rigid and shaking, lying next to his wife. He told rescuers he was jerked out of a chair and hit over the head. He died eight hours later. A pathologist testified that Mr. Hudnall died of a heart attack as a result of stress related to the circumstances leading up to his death. The court overruled defendant's contention on the premise that defendant inflicted injury on Mr. Hudnall which contributed mediately to his death. The fact that other causes contributed to the victim's death did not relieve defendant of responsibility.

In *State v. Vaughn*, 707 S.W.2d 422 (Mo. App.1986), defendant struck the decedent with his hands and kicked him. Decedent was a person enfeebled by heart disease. His death resulted from stress induced by the kicks which caused an irregular heart rhythm and sudden death. The blows to decedent, absent the latent heart disease, would not have caused his death. Regardless, a person "is criminally responsible for a homicide by whatever means it is accomplished, provided it was proximately caused by his unlawful act. A person proximately causes the death of another, and hence is criminally culpable where: 'the deceased was in feeble health and died from combined effects of the injury and of his disease....' It is immaterial that the defendant did not know the deceased was in the enfeebled condition which facilitated the death, or that he did not anticipate the conduct would cause death." *Id.* at 426 (citations omitted).

■ Applying the above principles to the instant case, we find ample evidence of

causation to support the guilty verdict. Eye witness testimony revealed Defendant struck the victim, a small man, with such force his head hit the ground making a sound like a bowling ball dropped on a carpet. Defendant admitted he hit the victim "very hard," that he was very mad and probably kicked the victim after he had fallen. The uncontradicted testimony of the pathologist revealed the victim suffered a massive hemorrhage of the brain, and such injuries were consistent with the victim striking the ground. Even though the victim was a feeble person and was susceptible to bleeding of the brain it is immaterial that defendant did not know of the victim's condition or that he did not anticipate the conduct would cause death. *Vaughn,* 707 S.W.2d at 426.

██ Though not raised in this point relied on (Point I), Defendant's argument raises two additional points. He launches into a discussion of failure of the State to prove (a) the *corpus delicti* and (b) that Defendant struck the victim with knowledge that his conduct tended to endanger the victim's life. These two issues, not raised under Point I and advanced for the first time in the argument portion, have not been preserved for appellate review. Rule 30.06(d) and (e).[2] *See Garrett v. State,* 778 S.W.2d 389, 391 (Mo.App.1989). However, we have gratuitously examined the record on both issues and find no plain error within the context of Rule 30.20. Point I is denied.

Defendant's last point assails Instruction 4, patterned after MAI–CR3d 302.04, defining "reasonable doubt." His contention rests on *Cage v. Louisiana,* 498 U.S. ——, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), where the United States Supreme Court reaffirmed the "beyond a reasonable doubt" standard necessary for a conviction.

Candidly, Defendant admits in his argument:

Appellant acknowledges that the Missouri Supreme Court has recently reaffirmed its decision in *State v. Antwine,* 743 S.W.2d 51, 62–63 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct.

1755, 100 L.Ed.2d 217 (1988); *State v. Reginald Griffin,* No. 70398 [818 S.W.2d 278] (Mo. banc, October 16, 1991). Appellant maintains his objection to the current reasonable doubt instruction, however, in anticipation that the federal courts will find that MAI–CR3d 302.04 does not meet the requirements of due process as enunciated in *Cage v. Louisiana, supra.*

In *Antwine,* our Supreme Court approved a reasonable doubt instruction identical to Instruction 4. Again, in *Griffin,* our Supreme Court reaffirmed its decision in *Antwine* in light of *Cage.* We are bound to follow decisions of our Supreme Court. Mo. Const. art. V, § 2. Point II is denied.

Judgment affirmed.

FLANIGAN, C.J., and SHRUM, P.J., concur.

2. Rule references are to Missouri Rules of Court (1991).